ROBERT J. BROWN ET AL. *v.* DIANE SOH ET AL.
(SC 17364)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued May 16—officially released November 14, 2006

*Steven D. Ecker,* with whom, on the brief, were *George C. Jepsen* and *Michael A. Stratton,* for the appellant (named plaintiff).

*Peter A. Kelly*, with whom was *J. Michael Sulzbach*, for the appellee (named defendant).

*J. Michael Sulzbach*, for the appellees (defendant David J. Fenn et al.).

*Opinion*

BORDEN, J. The principal issue in this appeal is whether an employee's negligence claim is precluded when he or she has signed an exculpatory agreement prospectively releasing the employer and other specified groups from liability for negligent acts that cause injury to the employee. The trial court concluded that the claim is precluded as a matter of law and rendered summary judgment in favor of the defendants. We disagree with that conclusion and, accordingly, reverse the judgment of the trial court.

The plaintiffs, Robert J. Brown and Denise A. Brown, sought damages from the defendants, Diane Soh, David J. Fenn, DaimlerChrysler Corporation, the Skip Barber Racing School, LLC, and the Skip Barber Racing School, Inc. (racing school),[1] for injuries that the plaintiff[2] sustained while employed by the racing school. After the trial court, *Brunetti, J.*, granted the racing school's motion for summary judgment on two counts of the

---

[1] The Skip Barber Racing School, LLC, is the successor company of the Skip Barber Racing School, Inc. It is clear from the pleadings filed on behalf of the racing school that the Skip Barber Racing School, LLC, and the Skip Barber Racing School, Inc., are, in essence, one entity for purposes of this litigation.

[2] Denise Brown alleged derivative claims for loss of consortium. The appeal form lists only Robert Brown as an appellant and the appellants' briefs are filed on behalf of Robert Brown. The docketing statement filed on behalf of Robert Brown, however, also lists Denise Brown as an appellant. Practice Book § 63-4 (4) requires the appellant to list "the names . . . of all parties to the appeal . . . ." In light of this conflict, and in light of the absence of any indication that Denise Brown's derivative claim was intended to be severed from Robert Brown's claim, we consider Denise Brown and Robert Brown as the appellants. For convenience, however, we refer to Robert Brown as the plaintiff in this opinion.

operative complaint, the remaining defendants, Soh, Fenn, and DaimlerChrysler Corporation, moved for summary judgment as well. In August, 2004, the trial court, *Pickard, J.*, granted their motions for summary judgment and rendered judgment thereon. The plaintiff appealed to the Appellate Court from the judgment of the trial court rendered in favor of Soh, Fenn, and DaimlerChrysler Corporation,[3] and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The record reveals the following facts and procedural history. On September 19, 2001, the racing school offered to the public a one day advanced driving class focused on accident avoidance and prevention. Soh was a student in the class, and the plaintiff and Fenn were employed by the racing school as driving instructors. The driving took place in a restricted area and everyone who entered the area, including the plaintiff, was required by the racing school to sign a document entitled "Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement" (exculpatory agreement). In the exculpatory agreement, the plaintiff acknowledged the dangerous nature of the activities in which he was about to participate, assumed full responsibility for any risk of injury, and covenanted not to seek recovery from those involved.[4]

---

[3] The trial court rendered summary judgment in favor of the racing school as to counts five and six of the complaint only, and the plaintiff did not challenge that decision on appeal. The trial court did not dispose of counts seven and eight of the complaint against the racing school, which were withdrawn in December, 2005. At that time, the racing school also withdrew its counterclaim against the plaintiff. As a result, the racing school is not a party to this appeal. References to the defendants are to the remaining defendants only, namely, Soh, Fenn and DaimlerChrysler Corporation.

[4] Specifically, the agreement provides in relevant part: "IN CONSIDERATION of being permitted to . . . work for . . . or being permitted to enter for any purpose any RESTRICTED AREA . . . [the plaintiff] . . . HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promotors, participants . . . track owners, officials, car owners, drivers . . . any persons in any RESTRICTED AREA . . . FROM ALL LIABILITY

During the final exercise of the day, Soh was driving a Dodge sedan owned by the DaimlerChrysler Corporation. Fenn was in the passenger seat, acting as her instructor. The plaintiff had been assigned to wave a checkered flag during the exercise and was therefore working in the restricted area near the driving course when the car driven by Soh struck him, causing serious injuries.

In May, 2002, the plaintiff brought this action against the defendants, seeking compensation for damages relating to the plaintiff's injuries. In May, 2003, the trial court granted the plaintiff's motion to cite in the racing school. The plaintiff then amended the complaint to add counts five through eight against the racing school. Thereafter, the racing school moved for summary judgment on counts five and six of the operative complaint, contending that the exculpatory agreement signed by the plaintiff prior to beginning work as an instructor

TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE. . . .

"HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise. . . .

"HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees . . . and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted . . . .

"I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW."

on the day of the accident precluded him from seeking compensation for the injuries that allegedly had been caused by the racing school's negligence. The trial court granted the motion on June 8, 2004, concluding that the exculpatory agreement, which expressly referred to negligence actions several times, satisfied the specificity of notice requirement established by this court in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 644, 829 A.2d 827 (2003). In so holding, the trial court also noted that the plaintiff's deposition, attached as an exhibit to the summary judgment motion, demonstrated that he was an adult with extensive experience with the dangers associated with racing and race tracks and had signed a similar agreement in August, 2001.

The remaining defendants thereafter moved for summary judgment, contending that the agreement signed by the plaintiff precluded negligence claims against them as well. The trial court considered the motions jointly and granted them on August 31, 2004. The court concluded that the exculpatory agreement satisfied the specificity requirement set forth by this court in *Hyson*, and rejected the plaintiff's claim that the defendants could not rely on the exculpatory agreement because it failed to specify them by name. The court further concluded that the lack of consideration to the plaintiff from each of the remaining defendants did not invalidate the exculpatory agreement. The trial court rendered judgment accordingly, and this appeal followed.

The plaintiff claims on appeal that the trial court improperly concluded that: (1) an exculpatory agreement prospectively releasing an employer and others from liability for negligence causing injury to an employee does not violate the public policy of Connecticut; (2) the reference in the agreement to covered "event[s]" had the requisite specificity to effectuate a

waiver; and (3) Connecticut law does not deem all form contracts that prospectively waive negligence claims to be unenforceable on public policy grounds. The defendants respond that the plaintiff cannot challenge the trial court's conclusion that the exculpatory agreement precluded actions in negligence against them as well as the racing school because the plaintiff did not appeal from the trial court's summary judgment rendered in favor of the racing school, which was based upon the validity of the exculpatory agreement. The defendants also contend that the agreement did not violate Connecticut public policy.

Prior to oral argument, this court, sua sponte, ordered the parties to file supplemental briefs regarding the impact of *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326, 885 A.2d 734 (2005). The plaintiff claims that reversal of the trial court's decision is a logical necessity in light of our decision in *Hanks*. The defendants respond that our decision in *Hanks* concerned exculpatory contracts signed by unwitting public users of commercial recreational services and that the public policy concerns expressed in that context do not militate against enforcement of an exculpatory agreement signed by an employee who is hired on the basis of his or her professional expertise for a brief and specific event that exposes the expert to certain risk with which the professional is fully familiar. We agree with the plaintiff that *Hanks* controls this case and, accordingly, we conclude that the defendants were not entitled to judgment in their favor as a matter of law.

As a preliminary matter, we set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant[s'] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn.* v. *Local Land Development, LLC*, 273 Conn. 724, 733, 873 A.2d 898 (2005). Moreover, we note that "whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Internal quotation marks omitted.) *Parente* v. *Pirozzoli*, 87 Conn. App. 235, 245, 866 A.2d 629 (2005), quoting 17A Am. Jur. 2d 312, Contracts § 327 (2004).

It is well established that "contracts that violate public policy are unenforceable." *Solomon* v. *Gilmore*, 248 Conn. 769, 774, 731 A.2d 280 (1999). In *Hanks*, this court concluded that "[t]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 330. Our analysis is guided by certain factors, first described by the California Supreme Court in *Tunkl* v. *Regents of the University of California*, 60 Cal. 2d 92, 98–101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963) (*Tunkl* factors), such as whether: (1) the exculpatory agreement concerns a business of a type generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for

some members of the public; (3) the party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services; (5) in exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a signatory may pay additional reasonable fees and obtain protection against negligence; and (6) the person or property of the signatory, as a result of the transaction, is placed under the control of the party seeking exculpation, subject to the risk of carelessness by that party or his agents. *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 328–30 (discussing *Tunkl* and its progeny). Clearly, an exculpatory agreement may affect the public interest adversely even if some of these factors are not satisfied. Id., 328. Moreover, our review is not limited by these factors. We also consider, in our analysis of the totality of the circumstances, "any other factors that may be relevant given the factual circumstances of the case and current societal expectations." Id., 330.

We now turn to the merits of the plaintiff's claim. The exculpatory agreement presently at issue was signed by the plaintiff at the behest of his employer. It purported to release the employer and others from liability for injury to the plaintiff caused by their negligence.

Connecticut courts have not yet addressed exculpatory agreements in an employment context. We note, however, that, in contrast to the commercial recreational services context that we examined in *Hanks*, exculpatory agreements are "almost universally rejected in the employment context, where exculpatory

agreements exempting an employer from all liability for negligence toward his employees [are] void as against public policy." (Internal quotation marks omitted.) *Bunia* v. *Knight Ridder*, 544 N.W.2d 60, 63 (Minn. App. 1996) (newspaper's exculpatory agreement with newspaper carrier violated public policy given parties' disparity in bargaining power), review denied (Minn. May 9, 1996), quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 68, p. 482. "The common law pertaining to master and servant has long recognized that an employer or master may not, by contract in advance, absolve itself from liability for injuries sustained by its employee or servant that are caused by the employer's or master's own negligence. See, e.g., *Pittsburgh*, *[Cincinnati, Chicago & St. Louis Railway] Co.* v. *Kinney*, 95 Ohio St. 64, 72, 115 N.E. 505 (Ohio 1916); *Pugmire* v. *Oregon Short Line R.R. Co.*, 33 Utah 27, 92 P. 762 (Utah 1907). Such agreements were considered to be void as against public policy." *Edgin* v. *Entergy Operations, Inc.*, 331 Ark. 162, 167, 961 S.W.2d 724 (1998).

When we apply the factors that guide us, we conclude that exculpatory agreements in the employment context violate Connecticut public policy. Four of the *Tunkl* factors weigh strongly in favor of the plaintiff.

First, we note that workplace safety and compensation for workplace injuries are areas subject to public regulation. See generally Occupational Safety and Health Act, General Statutes § 31-367 et seq.; Workers' Compensation Act, General Statutes § 31-275 et seq. Indeed, the Connecticut legislature has enacted "a complex and comprehensive statutory scheme balancing the rights and claims of the employer and the employee arising out of work-related personal injuries." *Durniak* v. *August Winter & Sons, Inc.*, 222 Conn. 775, 781, 610 A.2d 1277 (1992). Insurance or self-insurance by employers is mandatory and the law expressly provides

that they cannot contract away their statutory obligations. See General Statutes §§ 31-284 and 31-290.

We further note that an employer, in this case the racing school, possesses a decisive advantage of bargaining strength against the plaintiff employee. Considering the "economic compulsion facing those in search of employment . . . [t]o suppose that [a] plaintiff . . . had any bargaining power whatsoever defies reality." *White* v. *Homewood*, 256 Ill. App. 3d 354, 359, 628 N.E.2d 616 (1993) (holding exculpatory agreement between employer and job applicant contrary to public policy and rejecting contentions that plaintiff freely chose to apply for position and that employer did not have monopoly on job market as plaintiff could apply elsewhere), appeal denied, 155 Ill. 2d 577, 633 N.E.2d 16 (1994).

It is also highly significant that, in exercising this superior bargaining power, the racing school confronted the plaintiff with a standardized adhesion contract of exculpation. The agreement signed by the plaintiff was "offered . . . on a 'take it or leave it' basis." *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 333. "The most salient feature [of adhesion contracts] is that they are not subject to the normal bargaining processes of ordinary contracts," and they tend to involve "standard form contract[s] prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms . . . ." (Internal quotation marks omitted.) Id. As in *Hanks* and *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 905 A.2d 1156 (2006), it would ignore reality to conclude that the plaintiff wielded the same bargaining power to determine the terms of the exculpatory agreement as the racing school, which required him to sign it. He had "nearly zero bargaining power with respect to the negotiation of the [exculpatory agreement] and in order to participate in the activity,

[the plaintiff] was required to assume the risk of the defendants' negligence." Id., 163.

Another important consideration in deciding if an exculpatory agreement violates public policy is whether the signatory will be under the control of the person seeking exculpation from negligence and subject to the risk of that person's carelessness. By definition, an employee agrees to be under the control of the employer and is therefore exposed to the employer's carelessness. See, e.g., Black's Law Dictionary (7th Ed. 1999) (defining employee as "[a] person who works in the service of another person [the employer] under an express or implied contract of hire, under which the employer has the right to control the details of work performance"). In the employment context, the employer generally has the greater ability to avoid harm because the employer chooses the workplace and assigns tasks to the employees. As we previously have noted, "it is consistent with public policy to posit the risk of negligence upon the actor and, if this policy is to be abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 327. If employers were permitted to obtain broad waivers of their liability, an important incentive to manage risk would be removed. It would be unwise, in these circumstances, to undermine the public policy underlying the allocation of risk in tort law by allowing employees to bear risks they have no ability or right to control.[5]

---

[5] The remaining two *Tunkl* factors do not weigh heavily in our analysis. The fact that an employer does not hold employment out to any member of the public who seeks it does not lessen the public policy in favor of protecting those who do accept employment. Similarly, whether a particular employer is engaged in performing a great public service, which is a matter of practical necessity for some members of the public, does not affect our analysis. Employment is presumably a practical necessity for one seeking employment and, as demonstrated by the regulation in this area, there is

Moreover, we note that our conclusion is consistent with the view of the American Law Institute, as embodied in 2 Restatement (Second), Contracts § 195 (1981),[6] and 2 Restatement (Second), Torts § 496B, comment (f) (1965).[7]

In light of our application of the *Hanks* analysis, we conclude that the exculpatory agreement violates the public policy of the state and is invalid. We therefore need not consider the plaintiff's claims that the trial court incorrectly concluded that the exculpatory agreement signed by the plaintiff was clear and unambiguous or that all agreements prospectively waiving liability for negligence conflict with Connecticut public policy.

The defendants contend, however, that the critical question here is not whether the exculpatory agreement occurred in the employment context, because everyone entering the restricted area was required to sign the agreement, but whether an arm's-length transaction between knowledgeable parties will be upheld. In particular, the defendants contend that the plaintiff was a

clearly a public interest in providing a safe workplace and in properly allocating risk between employees and employers in any type of business.

[6] Section 195 of the Restatement (Second) of Contracts provides in relevant part: "(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

"(a) the term exempts an employer from liability to an employee for injury in the course of his employment . . . ." 2 Restatement (Second), supra, § 195, p. 65.

[7] Comment (f), elucidating § 496B of the Restatement (Second) of Torts, provides in relevant part: "Where the defendant and the plaintiff are employer and employee, and the [exculpatory] agreement relates to injury to the employee in the course of his employment, the courts are generally agreed that it will not be given effect. The basis for such a result usually is stated to be the disparity in bargaining power and the economic necessity which forces the employee to accept the employer's terms, with the general policy of the law which protects him against the employer's negligence and against unreasonable contracts of employment." 2 Restatement (Second), supra, § 496B, comment (f), p. 567.

professional racing driver who had worked at classes previously given by the racing school and was able to assess the risk. We are not persuaded. Where a standard form adhesion contract is presented and signed without opportunity to negotiate, the relative experience of an employee, which might allow him or her to negotiate well, should not affect the analysis. Exculpatory agreements must be viewed as applied to the potential class of signatories, many of whom may not be of comparable experience. See *Reardon* v. *Windswept Farm, LLC,* supra, 280 Conn. 162 and n.9.

We also reject the defendants' claim that the propriety of shifting the cost of an employee's injuries should not be a factor in our *Hanks* analysis because the racing school provided workers' compensation insurance coverage. The terms of the exculpatory agreement presently at issue do not address insurance coverage but instead explicitly release the employer and others from any and all loss arising out of the event for which the plaintiff was hired as an instructor, including all losses caused by the negligence of the employer. We therefore do not address the efficacy of exculpatory agreements that do not purport to waive all employer liability; see, e.g., *Edgin* v. *Entergy Operations, Inc.,* supra, 331 Ark. 167 (limited agreement in which employee relinquishes claims against employer's clients or customers for work-related injuries already covered by workers' compensation benefits does not violate public policy); and whether workers' compensation insurance ultimately was provided is not a factor considered in analyzing the terms of the agreement presently before us.

Finally, the defendants contend that the plaintiff cannot challenge Judge Pickard's conclusion that the exculpatory agreement precluded the negligence claims against them because the plaintiff failed to challenge Judge Brunetti's summary judgment in favor of the racing school, which was predicated on the validity of

the exculpatory agreement. Specifically, the defendants claim that, when Judge Brunetti rendered summary judgment in favor of the racing school, a final judgment on the merits of the action was made, which, under the doctrine of res judicata, precluded the plaintiff from relitigating the efficacy of the exculpatory agreement. We disagree with the defendants.

The defendants' reliance on the doctrine of res judicata is misplaced because Judge Brunetti's summary judgment in favor of the racing school was not an appealable final judgment when Judge Pickard made his ruling on August 31, 2004.[8] Consequently, this matter is controlled by the doctrine of the law of the case.[9] Under that doctrine, it is well established that "[a] judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings . . . ." (Internal quotation marks omitted.) *Breen* v. *Phelps*,

---

[8] Judge Brunetti's summary judgment for the racing school was merely a partial judgment because it disposed of counts five and six of the complaint only, and did not address the remaining counts against the racing school, which were not withdrawn until December, 2005. See footnote 3 of this opinion; see also *Kelly* v. *New Haven*, 275 Conn. 580, 594, 881 A.2d 978 (2005) (judgment that disposes of only part of complaint is not final judgment); Practice Book § 61-3 (same). Although a party may appeal from a partial judgment in certain circumstances; see Practice Book § 61-3 (party may appeal from partial judgment if it disposes of all causes of action against particular party or parties); Practice Book § 61-4 (a) (party may appeal if trial court makes written determination regarding significance of issues resolved by judgment and chief justice or chief judge of court having appellate jurisdiction concurs); those circumstances are not present here.

[9] We note that "[i]f the first decision was final, in the res judicata sense, it cannot be disregarded under the doctrine of the law of the case. If, however, the first decision was not final, but was merely interlocutory, it falls within the doctrine of the law of the case." *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 403, 685 A.2d 1108 (1996), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999). "Whereas a decision of one trial judge that is res judicata is binding on the second judge who confronts it, a decision of one trial judge that declares the law of the case is not a limitation on the power of the second judge in the case to decide otherwise, under appropriate circumstances." Id., citing *Breen* v. *Phelps*, 186 Conn. 86, 99, 439 A.2d 1066 (1982).

186 Conn. 86, 98, 439 A.2d 1066 (1982). "The adoption of a different view of the law by a judge in acting upon a motion for summary judgment than that of his predecessor in considering such a motion or some other pretrial motion is a common illustration of this principle. . . . From the vantage point of an appellate court it would hardly be sensible to reverse a correct ruling by a second judge on the simplistic ground that it departed from the law of the case established by an earlier ruling. . . . In an appeal to this court where views of the law expressed by a judge at one stage of the proceedings differ from those of another at a different stage, the important question is not whether there was a difference but which view was right." (Citations omitted; internal quotation marks omitted.) Id., 100. We therefore reject the defendants' claim that the plaintiff's failure to challenge Judge Brunetti's ruling bars him from challenging Judge Pickard's subsequent ruling that the exculpatory agreement precluded negligence claims against them.

The judgment is reversed and the case is remanded with direction to deny the defendants' motions for summary judgment, and for further proceedings according to law.

In this opinion the other justices concurred.