STATE OF CONNECTICUT *v.* DANIEL P. LYNCH
(SC 17996)

Rogers, C. J., and Palmer, Vertefeuille, Schaller and Quinn, Js.

Argued February 7—officially released June 24, 2008

*Jackie Chan*, with whom was *Steven Boa DeMoura*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The defendant, Daniel P. Lynch, appeals[1] from the judgment of conviction, following a jury trial, of four counts of failure to pay wages in violation of General Statutes § 31-71b.[2] The question

---

[1] The defendant filed his appeal with the Appellate Court. We thereafter transferred it to this court pursuant to General Statutes § 51-199 and Practice Book § 65-1.

[2] General Statutes § 31-71b provides in relevant part: "(a) Each employer . . . shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer . . . .

"(b) The end of the pay period for which payment is made on a regular pay day shall be not more than eight days before such regular pay day . . . ."

Pursuant to General Statutes § 31-71g, an employer who fails to comply with the foregoing provisions "may be: (1) Fined not less than two thousand nor more than five thousand dollars or imprisoned not more than five years or both for each offense if the total amount of all unpaid wages owed to an employee is more than two thousand dollars . . . ." Lesser fines and terms of imprisonment are prescribed, on a sliding scale, for failures to pay wages of less than $2000. See General Statutes § 31-71g (2), (3) and (4).

presented by this appeal is whether an agreement between an employer and his employees, providing that the employees' back wages will not become "due" within the meaning of § 31-71b (a) until the employer receives revenue sufficient to pay those wages, is contrary to public policy and, therefore, an invalid defense in a criminal prosecution for failure to pay wages. The defendant claims that, because he presented evidence that he had such an agreement with his employees, the trial court improperly: (1) refused to instruct the jury that if that evidence was credible, the defendant should be absolved of criminal liability; and (2) concluded, as a matter of law, that an agreement to defer the accrual of wages is contrary to public policy and, therefore, an ineffective defense to the crime of failure to pay wages. In this case, the undisputed evidence showed that, at the time of the claimed agreement, the defendant already owed his employees back wages for work they previously had performed. Because those wages already had accrued and become due within the meaning of § 31-71b, the claimed agreement offends the policy underlying the statute. The court, therefore, properly declined to instruct the jury as requested. Moreover, although we previously have held that an agreement to defer the accrual of future wages until an employer receives income is not contrary to public policy; see *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 725, 941 A.2d 309 (2008); because the claimed agreement at issue in the present case was to operate retroactively as well as prospectively, the court's ruling that the agreement was invalid was correct. Accordingly, we affirm the judgment of the trial court.

The following procedural history and facts, which the jury reasonably could have found, are relevant to the appeal. In January, 1997, the defendant formed Wireless Communications Products, LLC (Wireless), a start-up

company specializing in the development of infrared communications systems, and he subsequently became the majority owner and managing member of that company. Wireless was a small company, employing no more than twelve people during the period in which it was viable.

Wireless started to experience cash flow problems in November, 1999, and, by mid-2001, began missing its biweekly payroll. These problems intensified after the terrorist attacks of September 11, 2001, which negatively impacted the business environment within which Wireless sought to operate. Wireless' wage payments continued to be late and/or intermittent throughout 2002.[3] After January, 2003, employees ceased to be paid. Nevertheless, throughout this time period, the defendant did not consider laying off any of these employees.

Four Wireless employees eventually filed claims for unpaid wages with the commissioner of labor (commissioner) and, ultimately, ceased working for the company. The commissioner subsequently referred the employees' claims to a state's attorney for prosecution. Raymond Kallio, a mechanical engineer whose annual salary was approximately $50,000, stopped working for Wireless on May 9, 2003. At the time of trial in October, 2005, Kallio still was owed $27,597. Steven Gallo, an electrical engineer whose annual salary had ranged from $84,000 to $110,000, left the company in April, 2004. At the time of trial, Gallo still was owed $99,450. Jamie Saulnier, Wireless' director of engineering whose annual salary had ranged from $85,000 to $108,000, left the company in December, 2004. At the time of trial, Saulnier was owed $125,192. Joan Fickett, who had performed administrative and accounting functions for an annual salary of $37,000 to $41,000, also left Wireless

---

[3] One employee testified that sixteen biweekly payrolls were missed in 2002, and that only six of them eventually were paid.

in December, 2004. At the time of trial, she was owed $21,137.

At trial, the defendant did not dispute that he had failed to pay the amounts claimed. He testified, however, that in the latter half of October, 2002, he had a meeting with all four employees at which he discussed Wireless' prospects for securing an important government contract. According to the defendant, he told the employees that Wireless had no other source of revenues, but that if the contract was awarded to Wireless, it would pay both their past and future wages. The defendant claimed that he asked the four employees to "give [him] a pay deferral arrangement because *there's no money to pay the back pay. And there is a possibility that you might not get it.*" (Emphasis added.) The defendant testified further that he also offered the employees an equity interest in the company in the event they failed to receive their wages pursuant to the pay deferral agreement. He described the purported agreement to defer wages as a "contingent pay obligation," pursuant to which the duty to pay the employees would arise only if and when Wireless received income.[4]

At the conclusion of trial, the defendant requested that the court instruct the jury, in part, as follows: "The defendant has offered evidence that in October, 2002, [Wireless] had an agreement with the four employee-claimants, [Saulnier, Fickett, Kallio, and Gallo], that going forward these employees would be paid for their work at agreed upon annual rates if and when [Wireless] had the necessary cash flow to pay their salaries. The defendant contends that wages were not due until [Wireless] had the necessary income to pay them. If

---

[4] All four employees testified at trial, but none confirmed that he or she had agreed overtly to the arrangement described by the defendant. At most, as indicated by Kallio, there was "a verbal commitment" or general understanding that the employees would receive their back pay late as money came into the company.

you find that there was such an agreement and that any of the claimants was subsequently paid pursuant to such an agreement, then the defendant did not violate the non-payment of wages statute.

"The foregoing charge is requested based upon the law as stated in *Mytych* v. [*May Dept. Stores Co.*, 260 Conn. 152, 162, 793 A.2d 1068 (2002)], wherein the [Supreme] Court states: 'wage statutes, as a whole, do not provide substantive rights regarding how a wage is earned; rather, they provide remedial protections for those cases in which the employer-employee wage agreement is violated.' "

The trial court, relying on the Appellate Court decision in *Haynes Construction Co.* v. *Cascella & Son Construction, Inc.*, 36 Conn. App. 29, 647 A.2d 1015, cert. denied, 231 Conn. 916, 648 A.2d 152 (1994), refused to give the requested charge, opining that an agreement such as that alleged by the defendant would violate public policy.[5] The trial court considered this court's holding in *Mytych* to be inapplicable, reasoning that it pertained only to the manner in which wages are to be calculated, and not to when they must be paid. Accordingly, the court instructed the jurors as follows: "It is not a defense to [the charges of failure to pay wages] that the defendant may have agreed with an employee to postpone payment of wages until the employer had the necessary income to pay him or her. Such agreements are not valid and may not be considered

[5] In *Haynes Construction Co.*, the Appellate Court stated, in dicta, that a subcontractor's agreement with its employees, whereby the subcontractor was to pay the employees part of their wages weekly and the balance of those wages when the subcontractor was paid by the general contractor, "appears to be illegal and violative of the public policy embodied in § . . . 31-71b . . . ." *Haynes Construction Co.* v. *Cascella & Son Construction, Inc.*, supra, 36 Conn. App. 40. A determination of the legality of the agreement was not necessary for disposition of the appeal.

by you." The jury thereafter returned a verdict of guilty as to all four counts.[6] This appeal followed.

The defendant claims that the trial court improperly refused to instruct the jury as he had requested and improperly concluded, as a matter of law, that agreements to defer accrual of wages until an employer receives income are contrary to public policy and, therefore, may not be asserted as a defense to charges of failure to pay wages. We conclude that in the present case, because it was undisputed that the defendant already owed his employees back wages at the time the agreement was claimed to have been reached and because the requested instruction did not differentiate between past and future wages but, rather, sought a complete acquittal on the basis of the claimed agreement, the trial court properly refused to give it. Furthermore, although agreements such as those alleged by the defendant, if they are to operate prospectively only, do not necessarily offend public policy, depending on the facts and circumstances of each case, because the court's ruling was directed at the agreement before it, which included back wages, that ruling was legally correct.

Because the defendant's claims are closely related, we will consider them together. The defendant attempted to assert a defense to the crime of failure to pay wages, which had a basis in our prior case law, and he requested a jury charge encompassing that defense. "If [a] defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction. . . . The defendant's right to such an

[6] At a subsequent sentencing hearing, the trial court ordered the defendant to pay a $2000 fine and sentenced him to an effective term of five years imprisonment, execution suspended, and five years of probation with special conditions, including restitution to the victims.

instruction is founded on the principles of due process. . . . Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject [the defense] into the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Varszegi*, 236 Conn. 266, 281, 673 A.2d 90 (1996). Conversely, the court "has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991).

The trial court's refusal to instruct the jury as the defendant requested was based on its determination that an agreement to defer wages is not a viable defense to a prosecution under § 31-71b, which presents a legal question. Accordingly, we afford that determination plenary review. *Hackett* v. *J.L.G. Properties, LLC*, 285 Conn. 498, 503, 940 A.2d 769 (2008). Similarly, whether the alleged agreement "is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Internal quotation marks omitted.) *Brown* v. *Soh*, 280 Conn. 494, 501, 909 A.2d 43 (2006).

The defendant argues that the agreement about which he testified, if found by the jury to have existed, would have precluded a finding that he had violated § 31-71b. He claims that, pursuant to this court's jurisprudence, the point at which wages become "due," as contemplated by § 31-71b (a); see footnote 2 of this opinion; and trigger the requirement of prompt payment is a proper subject of agreement between an employer and employee. Consequently, he urges, an agreement that wages do not accrue until the employer receives income does not violate the public policy underlying Connecticut's wage statutes, particularly when the employer is a small company with sophisticated employees who are

knowledgeable about the company's financial affairs.[7] According to the defendant, the trial court misconstrued this court's holding in *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 152, in concluding otherwise. The defendant claims that he presented sufficient evidence of such an agreement and, therefore, was entitled to have the jury consider it as a defense.

In *Mytych*, we considered the question of whether the defendant employer's practice of calculating the plaintiff employees' sales commissions by deducting from their respective gross sales figures a pro rata share of unidentified returns, i.e., those unattributable to a particular salesperson, violated a statutory provision disallowing unauthorized deductions from wages.[8] Id., 156. In concluding that it did not, we explained that Connecticut's wage statutes did not provide substantive standards for the determination of wages, which should be left to agreement between employer and employee, but rather, were remedial, namely, they require only that the wages agreed to will not be withheld for any reason. Id., 159–60. Stated otherwise, the statutes "do not provide substantive rights regarding *how* a wage is earned; rather, they provide remedial protections for

---

[7] In making this argument, the defendant also claims that the four employees held equity interests in Wireless and that their purported ownership status further weighs in favor of a conclusion that the claimed agreement does not violate public policy. Our review of the record, however, convinces us that the defendant failed to present sufficient evidence to show that the employees were owners of Wireless in October, 2002, or even thereafter. At most, the evidence showed that, in July, 2004, after an arrest warrant had been issued for the defendant, he distributed to the employees partnership income tax documents for the 2003 tax year, and, subsequently, he distributed similar documents for the 2004 tax year. The employees denied that they ever were owners of Wireless, and Saulnier opined that the tax documents were the defendant's attempt to create a "paper trail." The defendant does not explain, and it is not apparent to us, how such documents could effect a transfer of ownership interests in Wireless retroactively, in particular as far back as October, 2002.

[8] See General Statutes § 31-71e.

those cases in which the employer-employee wage agreement is violated. The wage agreement is not dictated by the statutes; instead, it is the integrity of that wage agreement that is protected by the statutory provisions." (Emphasis in original.) Id., 162; see also *Shortt* v. *New Milford Police Dept.*, 212 Conn. 294, 309, 562 A.2d 7 (1989) ("[o]ur statute [authorizing civil actions for unpaid wages] . . . does not embody substantive standards to determine the amount of wages that are payable but provides penalties in order to deter employers from deferring wage payments once they have accrued").

The trial court considered this holding to be limited to questions of *how* wages may be calculated, but not *when* those wages may accrue. It thus disagreed with the defendant that the wage statutes permit an employer and employee to agree upon when wages will become "due" as contemplated by § 31-71b. In deciding *Mytych*, however, this court explicitly rejected the plaintiffs' reasoning that their wages accrued at the time they rendered their services by making sales, thereby making any subsequent deductions by the employer improper under the applicable statutes. We stated: "In Connecticut, there is no such settled doctrine regarding the time at which an employee's rights to his wages vests and, in fact, we have concluded herein that *our wage payment statutes expressly leave the timing of accrual to the determination of the wage agreement between the employer and employee.* Here, the commission agreement provided that the plaintiffs' wages were calculated after the deduction for unidentified returns." (Emphasis added.) *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 164–65.

While the appeal in this matter was pending, we had an opportunity to expand upon the principles enunciated in *Mytych*. In *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 719, the plaintiff employees

brought a civil action for unpaid wages[9] against the defendant employer, a recently formed technology company, and the company's president. The plaintiffs were the company's engineering manager and its vice president of sales. Id., 721. Our decision recited the following pertinent facts. "On September 30, 2001, [the president] met with all employees of [the company] and advised them that, due to financial difficulties, [the company] could not meet its payroll. He further stated that he could not ask the employees to continue working for [the company] because it could not pay them. [The president] gave all employees the opportunity to resign, and four employees did so. The remaining employees, including the plaintiffs, continued working with the hope that the company would obtain the funds needed to pay them. [The president] referred to the employees who continued working without payment as employees who were working 'on a deferred compensation basis.' [The president] had told the remaining employees that [the company] would make every effort to obtain funding to pay them, but he did not guarantee the employees that they would be paid. The plaintiffs nevertheless voluntarily chose to remain at [the company] and continue working.

"On January 16, 2002, during another employees' meeting, [the president] again reviewed [the company's] poor financial position. He employed a power point presentation during which he informed employees that [the company] could not ask them to work if it could not meet payroll obligations. The plaintiffs nevertheless continued working for [the company].

"Thereafter, on March 11, 2002, [the president] convened a final employees' meeting. [The company] issued

[9] Civil actions brought pursuant to General Statutes § 31-72 and criminal prosecutions authorized by General Statutes § 31-71g are separate enforcement mechanisms for ensuring compliance with the requirements of, inter alia, § 31-71b.

a memorandum to all of its employees, informing them that: 'Effective [immediately], all employees will be furloughed until further notice.' " Id., 721–22. Thereafter, the plaintiffs filed claims with the commissioner for unpaid wages. Id., 722. Subsequently, they withdrew those claims and commenced a civil action in which they sought to recover the wages at issue, as well as attorney's fees, costs, interest and statutory double damages. Id. Prior to trial, the company had paid in full the plaintiffs' wages plus interest, but they continued to press their claims for double damages and attorney's fees. Id., 723. The trial court denied those claims, and the plaintiffs contested that denial on appeal. Id.

In affirming the trial court's ruling, we rejected the plaintiffs' argument that the defendants' salary deferral plan was unreasonable[10] as a matter of law. Id., 726. We concluded that when an employer experiencing financial hardship honestly informs its employees that it cannot meet future payroll and refrains from promising them that future payment will be made, the employer does not act unreasonably by allowing employees to continue working with the hope of future payment. Id., 725. We observed that such was "particularly true where the employees are experienced business people and members of management who choose to continue working in the hope that their services to the employer will improve the financial status of the company." Id. We noted further that we could envision "circumstances in which such a choice by employees may inure to their benefits particularly when the financial hardship is

---

[10] "Although [General Statutes] § 31-72 does not set forth a standard by which to determine whether double damages should be awarded in particular cases, it is well established . . . that it is appropriate for a plaintiff to recover attorney's fees, and double damages under [§ 31-72], only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 724.

short-lived and the financial status of the company ultimately improves." Id., 725–26. On the basis of the particular facts of the case, we concluded that the defendants' salary deferral plan was not unreasonable as a matter of law. Id., 726.

In light of our holdings in *Mytych* and *Ravetto*, we conclude that the trial court's ruling that the agreement violated public policy must be interpreted narrowly and limited to the facts before the court. In *Mytych*, we expressly stated that the question of when wages accrue is a proper subject of agreement between employer and employee. See *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 164–65. In *Ravetto*, we confirmed that an agreement between informed, sophisticated employees and their employer to defer accrual of future wages until the employer receives income is not unreasonable and, in fact, may well be beneficial to all parties concerned. See *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 725–26. It necessarily follows that such an agreement, under circumstances similar to those present in *Ravetto*, does not violate public policy and, accordingly, may provide a defense in a prosecution for failure to pay wages. In the present case, however, the court's ruling was based upon undisputed facts that, at the time of the alleged agreement in October, 2002, the defendant already had missed numerous biweekly payrolls. Records kept by the employees and admitted into evidence at trial showed that, at the time of the alleged agreement, all four employees were owed several thousand dollars in back pay, which already had accrued under the previously existing biweekly payment arrangement. The defendant's own testimony confirms that the employees were owed back pay, and at oral argument before this court, his counsel conceded that such was the case.

Because the instruction requested by the defendant did not differentiate between future wages and back

wages, if it had been given and followed by the jury, it would have absolved the defendant of liability not only for nonpayment of wages earned subsequent to October, 2002, but also for back wages that already had become "due" within the meaning of § 31-71b. In other words, it would have permitted enforcement of the agreement to negate a violation of the statute that already had occurred. An agreement to defer wages already due unquestionably violates the public policy underlying the wage statutes.[11] Essentially, it would nullify § 31-71b by permitting parties, by contract, to disregard the statutory requirement that those wages be paid promptly once due.

"[A]greements contrary to public policy, that is those that negate laws enacted for the common good, are illegal and therefore unenforceable." *12 Havemeyer Place Co., LLC* v. *Gordon*, 76 Conn. App. 377, 389, 820 A.2d 299, cert. denied, 264 Conn. 919, 828 A.2d 618 (2003). "[I]t is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract . . . ." (Internal quotation marks omitted.)

---

[11] We previously have acknowledged that "[o]ur legislature, in promulgating both civil and criminal penalties [for the enforcement of the wage statutes], recognized the important public policy of ensuring that employees receive wages due them." *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 463, 704 A.2d 222 (1997). "Senator Nancy L. Johnson said in committee hearings, held in 1978 to amend General Statutes § 31-72 to increase the penalties on employers, that the payment of earned wages is a basic gut-level right that should be assured by clear, strong state statutes . . . . Conn. Joint Standing Committee Hearings, Labor, 1978 Sess., pp. 154–55." (Internal quotation marks omitted.) *Butler* v. *Hartford Technical Institute, Inc.*, supra, 463 n.9.

*Robertson* v. *Stonington*, 253 Conn. 255, 260, 750 A.2d 460 (2000).

In light of the undisputed factual posture of this case, the instruction requested by the defendant effectively would have allowed the enforcement of an improper agreement to absolve the defendant of criminal liability. Accordingly, it was incorrect in law, and the trial court's refusal to give it was proper.

The judgment is affirmed.

In this opinion the other justices concurred.