OPINION OF THE COURT
Ellen M. Yacknin, J.
Introduction
Plaintiffs Benjamin Misek, Todd Durham and Lia Menaker have sued defendant Downstairs Cabaret Theatre, Inc. for payment of wages and bonuses allegedly owed under plaintiffs’ employment contracts with defendant.[2] Specifically, plaintiffs al *832 lege that defendant is liable for their wages from September 30, 2009, when they were discharged, to October 25, 2009, the end date of their contractual minimum employment period. Plaintiffs also allege that defendant is liable to them for their contractual bonuses.
Although each plaintiff sued separately, the three actions were consolidated for a single arbitrator’s hearing on December 2, 2009. The arbitrator’s decisions in the three cases were issued on December 8, 2009. Following a party’s demand for a trial de novo in each case, the court consolidated the three actions and conducted a joint trial in Mr. Misek’s and Mr. Durham’s cases on March 17, 2010. Because Ms. Menaker was unavailable on that date, the trial in her action was held on April 2, 2010.[3] At the March 17, 2010 trial, plaintiffs Benjamin Misek and Todd Durham testified for plaintiffs, and Christopher Kawolsky, producing director for Downstairs Cabaret Theatre, testified for defendant. At the April 2, 2010 trial, plaintiff Lia Menaker testified for plaintiff, and Mr. Kawolsky and Stephen Smith testified for defendant.[4]
To prevail in a civil action, a plaintiff must show, by a preponderance of the credible evidence, that he or she is entitled to a judgment in his or her favor against the other party. After hearing the testimony and reviewing the relevant documents, *833 the court makes the following findings of fact and conclusions of law.[5]
Findings of Fact
Plaintiffs Benjamin Misek, Todd Durham and Lia Menaker are young actors. In the spring and summer of 2009, each plaintiff entered into an employment contract, labeled a “Letter of Agreement,” with defendant Downstairs Cabaret Theatre, Inc. (Downstairs Cabaret) to perform in a stage production of “Country Roads: The Songs of John Denver” (Country Roads), a musical about the late singer, and other unspecified productions.
With the exception of the specific dates of employment and salaries, the terms and provisions in each plaintiffs employment contract are identical. Mr. Misek’s contract, signed by the parties on May 5, 2009, provided that Mr. Misek’s employment would commence “on or about May 4, 2009,” and that his “[m]inimal term of engagement is through September 13, 2009.” Mr. Durham’s contract, signed by the parties on June 22, 2009, provided that Mr. Durham’s employment would commence “on or about June 19, 2009,” and that his “[m]inimal term of engagement is through September 13, 2009.” Ms. Menaker’s contract, signed by the parties on August 22, 2009, provided that Ms. Menaker’s employment would commence “on or about August 22, 2009,” and that her “[m]inimal term of engagement is through October 25, 2009.”
In addition to their written contracts, various addenda were added to Mr. Durham’s and Mr. Misek’s contracts. A June 22, 2009 addendum to Mr. Durham’s contract provided that if Mr. Durham continued to perform in Country Roads past September 13, 2009, Mr. Durham’s fee would be raised to a “mutually agreed upon amount.” This addendum also provided that the contract’s engagement completion bonus will have been met by September 13, 2009 and that the full amount of the engagement completion bonus will be paid “at the end of the engagement.”
On September 15, 2009, Mr. Durham and Mr. Kawolsky entered into a second addendum to Mr. Durham’s contract that provided that Mr. Durham’s employment as an actor in Country Roads “will extend through October 25, 2009 with the same terms and conditions,” except that Mr. Durham’s weekly salary *834 would be raised by $50 effective the week beginning September 14, 2009. A September 18, 2009 addendum to Mr. Misek’s contract provided that Mr. Misek’s employment as an actor in “Country Roads: The Songs of John Denver” “will extend through October 25, 2009 with the same terms and conditions.”
Country Roads opened as scheduled on June 25, 2009. On August 2, 2009, the production halted temporarily. Mr. Misek and Mr. Durham voluntarily agreed to forgo their salaries during this hiatus. The show resumed on August 25, 2009, after Ms. Menaker was hired to replace an actor who had left.
During their first few weeks at Downstairs Cabaret, Mr. Misek and Mr. Durham engaged in several discussions with Mr. Kawolsky and Ann Marie Sanders, Downstairs Cabaret’s board secretary, regarding their contractual obligation to participate in promotional activities for the show. Mr. Misek and Mr. Durham testified that they engaged in several promotional activities, while Mr. Kawolsky testified that the two actors did not complete the number of promotional activities that were expected of them. Because of their different perspectives, in mid-September 2009, Mr. Misek and Mr. Durham agreed in writing to a specific number of hours they were required to devote to promotional activities. (See Sept. 18, 2009 addenda to letters of agreement between Ben Misek and Downstairs Cabaret, and between T.K. Durham and Downstairs Cabaret.)[6]
The parties nevertheless continued to quibble about the actors’ promotional efforts. On September 30, 2009, Mr. Kawolsky, Ms. Sanders, and Daniel Lavender, the director of another Downstairs Cabaret production, met with Mr. Misek, Mr. Durham, and Ms. Menaker to discuss Country Roads’ and the three actors’ future. At the meeting, Mr. Kawolsky advised Mr. Misek, Mr. Durham and Ms. Menaker that the production of Country Roads was closed and that their employment was terminated immediately.[7]
*835 Mr. Kawolsky did not offer any other roles in any other productions to any of the three actors.[8] Instead, he directed plaintiffs to vacate their temporary living quarters by the following morning. Shortly sifter this meeting, Downstairs Cabaret gave Ms. Menaker $50 for transportation to return home. Conclusions of Law
Discharge of Plaintiffs
On September 30, 2009, Downstairs Cabaret discharged each plaintiff from employment solely because it closed the production of Country Roads. Whether plaintiffs’ discharge was wrongful depends on whether, under their employment contracts, the parties intended that plaintiffs’ employment could be terminated prior to the end of their minimum employment periods solely because of the production’s closure. (See Greenfield v Philles Records, 98 NY2d 562, 569 [2002].)
The parties’ eight-page form employment contract was drafted by Downstairs Cabaret several years ago. Within the eight pages are several provisions governing plaintiffs’ right to employment and defendant’s right to terminate plaintiffs’ employment.
According to section 2 (A) of the contract, each plaintiff was hired:
“to perform a role in a production of [Country Roads] and additional roles in other productions to be determined running in repertory. Employer reserves the right to move Employee to a different role if circumstances warrant (including the right to move Employee to a different Show). . . . Employee understand^] that he/she may be interchanged into other productions under the same terms and conditions set forth herein. Employee also agrees to rehearse and perform other shows (in repertory).”
Further, under section 3: “Employer shall be entitled to Employee’s services exclusively . . . for the entire Employment *836 Period, and Employee shall not render performing services for any party other than the Employer during such period without Employer’s prior written consent . . . [including] auditions for upcoming shows.” Each plaintiff’s period of employment is defined in section 1:
“Employer hereby employs Employee and Employee hereby accepts employment by Employer on the terms and conditions herein contained for a period commencing on or about [specified start date] and, except as otherwise herein provided, ending upon the termination of the production. Minimum term of engagement is through [specified end date]. It is further agreed that the Employer reserves the right to schedule additional performance dates for the duration of this Agreement, under terms and conditions agreed herein.”
The contract’s minimum period of employment is reiterated in section 13: “Employee agrees to accept Employment for the minimum length of [specified start date] through [specified end date] but understands that the Show is on an open-ended run and employment will continue past [specified end date] under the same terms and conditions.”
Under section 14, “The Employment Period shall cease and terminate” upon the occurrence of one of the following delineated events:
“(A) The termination of the Show.
“(B) The termination of the Employee’s employment for cause ... In the event Employee’s employment is terminated pursuant to this Section 13 [sic] (B), no notice or severance pay shall be given by Employer.
“(C) The exercise of Employer’s option to terminate this Agreement upon the occurrence of any event of Force Majeure pursuant to Section 11 [sic] hereof.[9]
“(D) A minimum of four (4) weeks written notice provided by Employee to Employer for Rochester performances.”
Predictably, the parties interpret these contract provisions entirely differently. According to plaintiffs, these provisions entitled them to be employed through the end of their mini *837 mum period of employment even though the production of Country Roads was closed before the end of that period. In contrast, Downstairs Cabaret claims that the contract required it to employ plaintiffs only for the duration of Country Roads, regardless of each plaintiffs contractual minimum employment period.
The parties’ conflicting contract interpretations revolve around the ostensibly inconsistent contract provisions involving, on the one hand, plaintiffs’ employment responsibilities (sections 2 [A] and 3) and minimum employment periods (sections 1 and 13), and, on the other hand, the termination of plaintiffs’ employment upon the cessation of the production (sections 1 and 14 [A]). Because Downstairs Cabaret drafted the employment contract, any ambiguity in its terms must be construed strongly against Downstairs Cabaret. (See Arbeeny v Kennedy Exec. Search, Inc., 71 AD3d 177, 182 [1st Dept 2010]; Brodsky v Levy, 161 AD2d 1120, 1121 [4th Dept 1990].)
Read in isolation, sections 1 and 14 (A) suggest that under the contract, plaintiffs’ employment automatically ends upon Downstairs Cabaret’s closure of the “production” (section 1) or the “Show” (section 14 [A]). However, a contract must be read as a whole and construed to give meaning to all of its language. (See Beal Sav. Bank v Sommer, 8 NY3d 318, 324-325 [2007], citing Matter of Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003].) Moreover, an interpretation of a contract that renders language in the contract meaningless or superfluous is unsustainable. (See Beal Sav. Bank v Sommer, 8 NY3d at 324; Union Carbide Corp. v Affiliated FM Ins. Co., 68 AD3d 534, 536 [1st Dept 2009].) When sections 1 and 14 (A) are read in tandem with other clauses, it is evident that the contract did not provide for the termination of plaintiffs’ employment prior to the expiration of their specified minimum employment periods solely because of the closure of Country Roads.
According to section 2 (A), Downstairs Cabaret hired plaintiffs to perform not only in Country Roads, but in “additional roles in other productions to be determined.” Indeed, section 2 (A) authorizes Downstairs Cabaret to “interchange” each plaintiff from a role in one production to a role in a different production.
If Country Roads were the only “production” or “Show” that is referenced in sections 1 and 14 (A), then the provisions requiring plaintiffs to perform in other roles would be meaningless. These provisions are rendered meaningful in light of the entire contract only if construed to mean that plaintiffs’ employment *838 would be terminated upon the closure of all productions for which plaintiffs were hired under section 2 (A), not simply upon the closure of Country Roads.
Downstairs Cabaret’s narrow reading of sections 1 and 14 (A) also renders meaningless the contract and addenda provisions specifying plaintiffs’ minimum periods of employment. According to sections 1 and 13, each plaintiffs minimum employment period encompassed the specified start date to the specified end date. However, the contract also provided for Downstairs Cabaret’s unlimited extension of each plaintiffs employment period. In particular, under sections 1, 2 (A), and 13, each plaintiff was obligated to perform in any of Downstairs Cabaret’s productions for as long as Downstairs Cabaret required. Under section 14, a plaintiff who wished to end his or her employment with Downstairs Cabaret was required to provide four weeks written notice to the management, regardless of the minimum employment period.
Downstairs Cabaret contends that the only purpose of the contract’s minimum employment period provisions was to state the minimum time period each plaintiff was required to work, but not the minimum time period each plaintiff was entitled to work. However, this interpretation renders these clauses superfluous given the several other contract provisions requiring plaintiffs to perform in any Downstairs Cabaret production for unlimited, “open-ended” time engagements, subject only to a plaintiffs four-week written notice to end his or her employment. Indeed, under defendant’s interpretation, there would have been no need for Mr. Misek and Mr. Durham to sign the September 2009 addenda extending their minimum employment periods because sections 1 and 13 of the contract already gave Downstairs Cabaret the authority to extend their employment in Country Roads indefinitely. Consequently, the minimum employment period provisions are meaningful only if construed to give plaintiffs a minimum term of guaranteed employment, either in Country Roads or in another production.
Downstairs Cabaret’s interpretation of the contract’s minimum employment period provisions also effectively gives Downstairs Cabaret an unfair and unreasonable advantage over plaintiffs with respect to plaintiffs’ periods of employment that is counter to public policy. (See Mandelblatt v Devon Stores, 132 AD2d 162, 167 [1st Dept 1987].) As construed by Downstairs Cabaret, the contract obligated the actors to perform in any production for as long as required by Downstairs Cabaret, *839 subject to the actors’ four weeks written notice, but simultaneously provided for the immediate termination of the actors’ employment before the end of their minimum employment periods, with no advance notice whatsoever, upon the closure of a single production. Such an inequitable interpretation of the contract cannot be countenanced, particularly in light of a more reasonable and equitable interpretation of the contract that provides both parties a guaranteed minimum period of employment. (See Lai v Gartlan, 46 AD3d 237, 247 [1st Dept 2007], lv dismissed 10 NY3d 893 [2008] [contracts should be construed to avoid giving one party an unreasonable advantage over the other].)
For these reasons, based on the applicable principles of contract interpretation, the parties’ employment contract did not authorize Downstairs Cabaret to discharge plaintiffs within the contract’s specified minimum employment period solely because of the closure of Country Roads. Accordingly, Downstairs Cabaret’s discharge of plaintiffs prior to the end date of their minimum periods of employment constitutes a breach of plaintiffs’ contractual rights to employment.
Nonpayment of Bonuses
Section 4 sets forth the terms of plaintiffs’ compensation. For Rochester performances: “[w]eekly pay . . . will remain at the sum of [specified weekly salary] for each full week (to be divided between salary and bonus as outlined above in 4.A.)” Letter of agreement § 4 [B], at 3.) Under section 4 (A) and (B) (at 2) and section 4 (B) (at 3), the employee’s specified weekly salary “shall be divided up as [specified weekly salary minus $25] plus Twenty-Five Dollars ($25.00) bonus.” Pursuant to section 4 (C), the bonus is paid as follows:
“Twenty-five ($25.00) per week of the Employee’s salary is considered an Engagement Completion Bonus. Bonus will be capped at a cumulative total of $300.00. The Bonus will be held until the end of the engagement, or the end of the contract, or the end of employment if the Actor gives four weeks required notice (after [specified end date of the minimal term of engagement set forth in Section 1]). . . .If Employer terminates Employee prior to the completion of the engagement for any reason other than Section 5, 10 [sic] and / or refusal to perform, Employee will receive Bonus in full at that *840 time.[10] Should Employee leave without Employer’s approval, Employee will forfeit the Bonus.”
Thus, as defined by the contract, the bonus is a withheld portion of each plaintiffs earned salary.
Defendant does not dispute that it did not pay plaintiffs the bonuses described in section 4 of the parties’ contracts. Nor did defendant provide any explanation for Downstairs Cabaret’s failure to pay plaintiffs the bonuses they earned for the work they performed under the contract. Accordingly, plaintiffs are entitled to receive their withheld contractual bonuses.[11]
Amount of Damages
With respect to their wrongful discharge, plaintiffs are entitled to the wages they would have earned had they worked to the end of their minimum employment period. (See Rebh v Lake George Ventures, 241 AD2d 801, 803 [3d Dept 1997].) Plaintiffs are also entitled to the bonuses they were entitled to receive at the conclusion of their employment.
Plaintiffs are also entitled to statutory liquidated damages in connection with their unpaid bonuses. Under Labor Law § 198 (1-a), when an employer willfully fails to pay an employee owed wages: “unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, [the court shall allow such employee] an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.”
Because the contract’s bonus amount is, in fact, a withheld portion of each plaintiffs earned salary, plaintiffs’ contractually required bonuses are considered wages for purposes of this provision. (See Labor Law § 190 [1]; cf. Truelove v Northeast Capital & Advisory, 95 NY2d 220, 224 [2000] [“wages” in Labor Law § 190 (1) do not include a bonus that is discretionary and based on factors outside the scope of the employee’s actual work].) Defendant proffered no explanation for failing to pay plaintiffs *841 their bonuses, let alone a good faith basis for believing that its failure to do so was lawful. Accordingly, plaintiffs are entitled to statutory liquidated damages.
Conclusion
For the foregoing reasons, plaintiffs are entitled to the following judgments against defendant Downstairs Cabaret:
Plaintiff Benjamin Misek
Plaintiff Benjamin Misek is entitled to a judgment for the following damages: (1) $200 for the partial week from October 1, 2009 through October 4, 2009, and his salary of $350 a week for the full three weeks from October 5, 2009 through October 25, 2009, for a total of $1,250 as wages; (2) his withheld bonus amount of $300; and (3) statutory liquidated damages of $75.
In addition, Mr. Misek is entitled to: (1) preverdict interest from September 30, 2009 pursuant to CPLR 5001; (2) disbursements pursuant to Uniform City Court Act § 1908; and (3) $50 as expenses pursuant to Labor Law § 198 (1).
Plaintiff Todd Durham
Plaintiff Todd Durham is entitled to a judgment for the following damages: (1) $228.57 for the partial week from October 1, 2009 through October 4, 2009, and his salary of $400 a week for the full three weeks from October 5, 2009 through October 25, 2009, for a total of $1,428.57 as wages; (2) his withheld bonus amount of $300; and (3) statutory liquidated damages óf $75.
In addition, Mr. Durham is entitled to: (1) preverdict interest from September 30, 2009 pursuant to CPLR 5001; (2) disbursements pursuant to Uniform City Court Act § 1908; and (3) $50 as expenses pursuant to Labor Law § 198 (1).
Plaintiff Lia Menaker
Plaintiff Lia Menaker is entitled to a judgment for the following damages:[12] (1) $128.57 for the partial week from October 1, 2009 through October 4, 2009, and her salary of $225 a week for the full three weeks from October 5, 2009 through October 25, 2009, for a total of $803.57 as wages; (2) her withheld bonus *842 amount of $150;[13] and (3) statutory liquidated damages of $37.50.
In addition, Ms. Menaker is entitled to: (1) preverdict interest from September 30, 2009 pursuant to CPLR 5001; (2) disbursements pursuant to Uniform City Court Act § 1908; and (3) $50 as expenses pursuant to Labor Law § 198 (l).[14]

. Plaintiffs also named Christopher Kawolsky, Downstairs Cabaret’s producing director, as a defendant. However, there was no evidence at trial that *832 Mr. Kawolsky’s actions were taken in bad faith or outside the scope of his employment. Accordingly, plaintiffs’ claims against Mr. Kawolsky in his personal capacity are dismissed. (See Freyne v Xerox Corp., 98 AD2d 965 [4th Dept 1983].)

. The court made several attempts to schedule a single trial in all three cases. However, the fact that each plaintiff lives out of state and the parties’ varied schedules made a single trial impossible.

. At the April 2, 2010 trial, Ms. Menaker introduced into evidence an audio recording of a meeting she attended with Benjamin Misek, Todd Durham, Christopher Kawolsky, Ann Marie Sanders, and Daniel Lavender on April 30, 2009. Because the recording was not available at the March 17, 2010 trial, defendant’s attorney (who was not present at the March 17, 2010 trial) objected to the court’s consideration of the recording in connection with Mr. Misek’s and Mr. Durham’s claims because defendant’s attorney at the March 17, 2010 trial was unable to cross-examine Mr. Misek and Mr. Durham about their recorded statements. For that reason, the court agreed not to consider any statements made by Mr. Misek and Mr. Durham on the recording in its consideration of Mr. Misek’s and Mr. Durham’s claims against defendant. However, because defendant’s attorney at the April 2, 2010 trial had an opportunity to listen to the recording and to question Mr. Kawolsky about his recorded statements, it is not improper for the court to consider Mr. Kawolsky’s recorded statements in connection with Mr. Misek’s and Mr. Durham’s claims.

. Section 19 of the parties’ contract requires disputes to be submitted to binding arbitration. However, by pursuing this litigation without objection, the parties have waived their right to arbitration. (See Flores v Lower E. Side Serv. Ctr., Inc., 4 NY3d 363, 372 [2005].)

. An addendum delineating Ms. Menaker’s time requirements for promotional activities was prepared but never signed by Ms. Menaker or Mr. Kawolsky.

. At trial, Mr. Kawolsky testified that Downstairs Cabaret decided to close Country Roads on September 30, 2009 because of purportedly lower than expected box office revenues. This explanation, disputed by plaintiffs, is dubious given that only three days earlier, at 7:47 P.M. on September 27, 2009, Ms. Sanders sent an e-mail to the cast and staff advising them of Country Roads’ schedule from October 2, 2009 through October 11, 2009.

. At trial, Mr. Kawolsky testified that he had offered a role in another production to plaintiff Lia Menaker but that Ms. Menaker rejected that role. The court does not credit Mr. Kawolsky’s testimony, unsupported by any documentation, in this regard. The evidence shows that prior to the closure of Country Roads, Mr. Kawolsky and Ms. Menaker had preliminary discussions about Ms. Menaker’s participation in an additional production. However, there was no evidence that Downstairs Cabaret made a “definite and certain” offer to perform in another production that Ms. Menaker rejected. (Knight v Barteau, 65 AD3d 671, 672 [2d Dept 2009].) In any event, the evidence also shows that upon the closure of Country Roads, Mr. Kawolsky did not offer Ms. Menaker or any other plaintiff any roles in any other productions.

9. The contract’s “Force Majeure” provisions are in section 12, not section 11. The court notes that several contract provisions refer to incorrect or nonexistent section numbers.

10. Section 5 deals with unsatisfactory performances and actors’ failure to perform. Section 11, which appears to have been the intended reference in section 4 (C) instead of “Section 10,” deals with “Additional Obligations of Employee.”

. The legality of the contract’s bonus provisions permitting Downstairs Cabaret to withhold a portion of an employee’s salary is questionable. Under Labor Law § 193 (1), an employer is prohibited from making deductions from an employee’s wages that are neither authorized by the government nor in writing and made for the employee’s benefit.

. Defendant contends that any damages awarded to Ms. Menaker must be reduced by the $50 transportation allowance defendant gave her upon her discharge. This contention is meritless for two reasons. First, defendant imposed no contingencies on this allowance. Second, the parties’ employment contract provides for a transportation allowance “to and from all work related locations” unless the employee unilaterally leaves employment before the agreed upon end date. (See contract § 6 [B], [F].)

. The $25 weekly bonus amount was withheld from Ms. Menaker’s salary for the six weeks from August 22, 2009 through September 30, 2009.

. At trial, Ms. Menaker requested attorney’s fees associated with hiring an attorney to obtain an adjournment. Under Labor Law § 198 (1-a), an employee who prevails in a wage claim action is entitled to reasonable attorney’s fees. However, Ms. Menaker did not respond to the court’s April 6, 2010 invitation to submit documentation of legal expenses by April 20, 2010. Accordingly, Ms. Menaker’s request for attorney’s fees is denied.