(September 22, 2016)

■ Frenkel Benefits, LLC, Doing Business as Frenkel & Company, Appellant-Respondent, v Joseph Mallory et al., Respondents-Appellants. [37 NYS3d 508]—

Order, Supreme Court, New York County (Jeffrey K. Oing, J.), entered on or about August 28, 2015, which denied the parties' motions for summary judgment, affirmed, on the law, without costs.

Many of the facts underlying this motion are not in dispute. In October 2005, defendant Joseph Mallory became employed by plaintiff Frenkel Benefits LLC (Frenkel). On October 7, 2005, Frenkel and Mallory signed a letter agreement that was drafted by Frenkel's former general counsel. In relevant part, the letter agreement provided as follows: "[Mallory] will not, directly or indirectly, without the written consent of Frenkel . . . for a period of 24 months from the date [he] cease[s] to be employed by Frenkel, knowingly, solicit, represent in any capacity or accept business from any of Frenkel's clients or accounts or 'prospective clients or accounts' with which [he] had any involvement while [he] [was] employed by Frenkel insofar as such solicitation, representation or business involves the brokering or placement of insurance" (emphasis omitted). The letter agreement did not define "insurance," although it defined other terms.

Mallory resigned from Frenkel, effective February 11, 2011. At that time, he held the title of vice-president of surety.

On February 28, 2011, Mallory began employment with defendant C&H Agency, Inc. (C&H), which is primarily a construction risk management firm. Mallory signed an employment agreement with C&H that provides the following: "10. *Non-Competition* . . . Employee agrees that during his employment and for a period of 36 months from and after the termination of his employment . . . he will not . . . (ii) solicit, attempt to obtain, accept or transact insurance business of any nature from any customer or account of the Company . . . (iii) aid or assist anyone in soliciting, attempting to obtain, or accepting insurance business of any nature from such customer or account."

While at C&H, Mallory communicated with two companies that had been surety clients of Frenkel. As a result, C&H, through Mallory, brokered surety bonds for those two companies.

Upon learning of this, Frenkel advised C&H that it had learned of Mallory's acts, and that it believed that his actions violated the letter agreement and that C&H was supporting his violations. Frenkel unsuccessfully sought assurance that C&H was taking steps to ensure Mallory's compliance with the letter agreement.

Frenkel then commenced this action, seeking damages against Mallory for breach of contract and against C&H for tortious interference, damages against both for unfair competition, and an injunction against both to enforce the letter agreement. After discovery and filing of a note of issue, Mallory and C&H moved for summary judgment dismissing the complaint and Frenkel cross-moved for partial summary judgment on liability. Both sides contend that "insurance" is unambiguous, but plaintiff claims that it includes surety bonds, and defendant contends that it does not. Alternatively, plaintiff argues that, if "insurance" is ambiguous, parol evidence shows that "insurance" includes surety.

In a thoughtful decision, the motion court correctly denied both parties' motions, finding that the term "insurance" was ambiguous, since it was unclear whether "insurance" included surety work. The court further correctly found that the parties' respective proffers of extrinsic evidence of the meaning of those terms did not resolve the issue but rather raised material issues of fact as to the contracting parties' intent when entering into the letter agreement.

Each party cites respectable support for its position as to the meaning of "insurance." For example, to demonstrate that surety is a type of insurance, Frenkel cites to Insurance Law

§ 1101, which defines "doing an insurance business in this state" to include the "making . . . [of] any contract of . . . suretyship" (Insurance Law § 1101 [b] [1] [B]), and to Insurance Law § 1113 (a), which defines "[t]he kinds of insurance which may be authorized in this state" to include "[f]idelity and surety insurance," which in turn is defined as "[a]ny contract bond; including a bid, payment or maintenance bond or a performance bond where the bond is guaranteeing the execution of any contract other than a contract of indebtedness or other monetary obligation" (Insurance Law § 1113 [a] [16] [C]). In addition, relying on the principle that "[t]he Superintendent[ ] [of Insurance's] interpretation of the Insurance Law provisions is entitled to great deference because of his special competence and expertise with respect to the insurance industry unless such interpretation is irrational or contrary to the clear wording of a statutory provision" (*Matter of Colonial Life Ins. Co. of Am. v Curiale*, 205 AD2d 58, 61-62 [3d Dept 1994], citing *Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins. of State of N.Y.*, 72 NY2d 753 [1988], *cert denied* 490 US 1080 [1989]), plaintiff directs the court's attention to two formal opinions of the New York State Insurance Department (NYSID),* which state unequivocally that a surety contract constitutes an insurance contract. Plaintiff also cites a New York judicial opinion holding the same. In contrast, defendants cite to *Pearlman v Reliance Ins. Co.* (371 US 132, 140 n 19 [1962]), in which the Supreme Court refers, in a footnote in a bankruptcy case, to "the usual view, grounded in commercial practice, that suretyship is not insurance," and to other decisions reaching similar results, none of which are from the courts of this state. On the other hand, defendants acknowledge in their brief that there are "myriad contexts in which the terms ['insurance' and 'suretyship'] sometimes merge and sometimes remain discrete." Thus the evidence produced by each side does not show that the interpretation urged by each is inevitable; rather, it shows that the language of the letter agreement is "on its face . . . reasonably susceptible of more than one interpretation" (*US Oncology, Inc. v Wilmington Trust FSB*, 102 AD3d 401, 402 [1st Dept 2013], quoting *Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]). Accordingly, the motion court properly denied the motions for summary judgment.

Our dissenting colleagues, in reaching the opposite result, rely heavily on the deposition testimony of Dan Culnen, C&H's

---

* In 2011, the NYSID and the New York State Banking Department were consolidated and became the New York State Department of Financial Services.

president, in which he states that C&H had concluded that the letter agreement did not bar Mallory from doing surety business with his clients at Frenkel, and that this was part of the reason C&H hired him. However, at a later point in the deposition, Mr. Culnen stated that, if Mallory were to leave C&H and broker surety for a competitor, C&H would consider it a breach of Mallory's employment agreement with C&H, which is identical in all relevant respects to the letter agreement. Therefore, rather than resolving the issues in defendants' favor, Mr. Culnen's deposition testimony creates further questions of fact.

The dissent also relies on the deposition testimony of Anthony Spina, an assistant vice-president at Frenkel, to establish that "surety" and "insurance" have different meanings. However, he also testified, in defining "surety," that the insurance company issuing the surety contract is referred to as the "surety," thus collapsing the two terms.

We also disagree with the dissent that, in order to determine the relationship between suretyship and insurance, we should give little weight to the provisions of the New York Insurance Law and the opinions of the NYSID and should instead rely on a footnote in a Supreme Court case, and cases from a federal court in Pennsylvania and a state court in North Carolina.

The dissent also argues that we have not taken into account the principles that noncompete agreements are to be interpreted narrowly, and that contracts are to be interpreted against the drafter. However, neither of those issues was raised below and therefore we cannot consider them at this time (*Sea Trade Mar. Corp. v Coutsodontis*, 111 AD3d 483, 486 [1st Dept 2013]). In addition, the noncompete clause in the letter agreement is limited in time, and does not prevent Mallory from pursuing his career, but only from soliciting, representing, or accepting business from any of Frenkel's clients with which he had contact while employed by Frenkel, and is therefore, not on its face, overbroad (*TBA Global, LLC v Proscenium Events, LLC*, 114 AD3d 571, 572 [1st Dept 2014] [nonsolicitation covenant limited to protecting company's client relationships and good will is enforceable]; *cf. BDO Seidman v Hirshberg*, 93 NY2d 382, 392 [1999] [limitation of former employee's use of client relationships beyond those acquired through work for the former employer was overbroad]). In any event, these doctrines can properly be taken into account by the motion court in its evaluation of the evidence proffered at the hearing on the contracting parties' intent at the time that they entered into the letter agreement. Concur—Sweeny, J.P., Kapnick and Gesmer, JJ.

Renwick and Moskowitz, JJ., dissent in a memorandum by Moskowitz, J., as follows: I disagree with the majority that this matter is appropriate for trial rather than summary disposition. On the contrary, I believe that the extrinsic evidence, which is admissible because the agreement is ambiguous as drafted, leads inexorably to the conclusion that the noncompete clause in the contracting parties' letter agreement permits defendant Joseph Mallory to engage in surety work. Therefore, I respectfully dissent.

In October 2005, when Mallory began working for plaintiff Frenkel Benefits, LLC, Frenkel presented Mallory with a letter agreement governing his employment. The agreement provided that for a period of 24 months after the end of Mallory's employment with Frenkel, Mallory was not to solicit, represent, or accept business from any of Frenkel's clients with which Mallory had any involvement while he was working for Frenkel, "insofar as such solicitation, representation or business involve[d] the brokering or placement of insurance." While certain terms in the letter agreement were defined, the term "insurance" was not. Mallory did not consult an attorney before signing the agreement.

According to Frenkel, Mallory's last position working with it was as vice-president of its surety division. Frenkel further stated that Mallory left its employ in February 2011 and began working for a competitor, defendant C&H Agency, Inc., an insurance brokerage focusing on the construction industry. Part of Mallory's duties at C&H included procuring surety bonds, and indeed, C&H hired Mallory specifically because it believed he was permitted to work in the area of surety bonds.

In April 2011, Frenkel learned that a surety client that Mallory had serviced while in Frenkel's employ had named C&H as its new broker of record; Frenkel alleged that Mallory had solicited that client and one other. As a result, Frenkel commenced this action against Mallory and C&H, alleging breach of contract (against Mallory); tortious interference with contract (against C&H); and unfair competition (against both Mallory and C&H). After discovery and the filing of a note of issue, defendants moved for summary judgment dismissing the complaint and plaintiff cross-moved for partial summary judgment on liability.

A contract will be considered ambiguous if it is "reasonably susceptible of more than one interpretation" (*Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]). Here, the motion court correctly found ambiguous the covenant restricting Mallory from brokering or soliciting "insurance" from any clients of plaintiff

with which he had been involved while working for plaintiff, as it was unclear whether the term "insurance" as used in the restrictive covenant included surety work (*see generally Banco Espírito Santo, S.A. v Concessionária Do Rodoanel Oeste S.A.*, 100 AD3d 100, 106 [1st Dept 2012]).

Thus, because the covenant is ambiguous, we may resort to extrinsic evidence in order to glean the contracting parties' intent (*Chimart Assoc.*, 66 NY2d at 572-573). Here, defendants' extrinsic evidence, and a well-settled canon of interpretation, support defendants' interpretation of the term in the covenant.

According to the deposition testimony, both C&H and Frenkel understood "insurance" and "surety" as separate fields, consonant with the common law's distinction (*see Pearlman v Reliance Ins. Co.*, 371 US 132, 140 n 19 [1962]; *Henry Angelo & Sons, Inc. v Property Dev. Corp.*, 63 NC App 569, 574, 306 SE2d 162, 166 [1983]; *Reginella Const. Co., Ltd. v Travelers Cas. & Sur. Co. of Am.*, 949 F Supp 2d 599, 611 [WD Pa 2013], *affd* 568 Fed Appx 174 [3d Cir 2014]). This industry usage is probative of the meaning that Frenkel and Mallory imputed to the term when they signed the letter agreement (*see Zurakov v Register.Com, Inc.*, 304 AD2d 176, 179 [1st Dept 2003]; *see also J.P. Morgan Inv. Mgt. Inc. v AmCash Group, LLC*, 106 AD3d 559 [1st Dept 2013]).

This conclusion holds especially true in light of the fact that Frenkel's own witness, an assistant vice-president in Frenkel's surety department, testified unequivocally that "surety" and "insurance" have different meanings. Specifically, Frenkel's witness testified that "surety" refers to a situation in which a third party—that is, a surety company—guaranties to an owner that a principal will perform the principal's obligations under a contract, whereas "insurance" is a transfer of risk arising from fortuitous events. In fact, Frenkel's witness testified that these definitions were customarily applied at Frenkel. Thus, Frenkel was well aware of the meaning of these term; had it wished to prevent Mallory from brokering both surety bonds and insurance products, it could have included "surety" in the scope of the covenant. It did not do so.

Further, even putting aside the applicable canon of construction, the law is well-settled that noncompetition agreements are to be construed as narrowly as possible and "rigorously examined" so as to avoid interfering with one's ability to earn a living (*American Broadcasting Cos. v Wolf*, 52 NY2d 394, 403-404 [1981] [noting "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" (internal quotation marks omitted)]). Interpreting the let-

ter agreement to include surety business as well as insurance business constitutes an overbroad and oppressive reading of the agreement (*see American Inst. of Chem. Engrs. v Reber-Friel Co.*, 682 F2d 382, 387 [2d Cir 1982] [as a matter of public policy, restrictive covenants are to be enforced "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists" (internal quotation marks omitted)]).

The majority's memorandum does not, as New York State law instructs us to do, view an anticompetitive covenant with disfavor (*see id.* at 386 [noting the "strict approach to enforcement" of anticompetitive covenants]). Rather, in effect, the majority places two principles, one in the company's favor and one in the employee's favor, on an equal footing, even though the law in this area intends quite the opposite (*see American Broadcasting Cos.*, 52 NY2d at 404 ["(t)here is, in short, general judicial disfavor of anticompetitive covenants contained in employment contracts"]; *see also International Bus. Machs. Corp. v Johnson*, 629 F Supp 2d 321, 337 [SD NY 2009] [applying New York law and noting that New York public policy "strong(ly) disfavor(s) . . . non-competition covenants in employment contracts" (alterations in original and internal quotation marks omitted)]).

In fact, with the possible exception of an answer from a representative of C&H (an entity that was not even a party to the letter agreement) to a hypothetical question at a deposition, nothing in the record suggests that Frenkel and Mallory intended to restrict Mallory's ability to work in surety bonding. On the contrary, the record makes clear that "insurance" and "surety" are two separate things, with the former not comprising the latter. And indeed, as I have noted, even an assistant vice-president of Frenkel—the entity that actually signed the letter agreement—so opined at his deposition.

The majority does not dispute the long-standing New York State policy that noncompete agreements are disfavored and are to be interpreted narrowly, nor does it dispute that contracts are to be interpreted against the drafter. Rather, the majority concludes that at the trial, those policies "can properly be taken into account." This conclusion, however, undoubtedly provides cold comfort to Mallory, as he is still obliged to wait for a trial, thus rendering him, for the time being, unable to pursue his livelihood free from the specter of ongoing litigation. The New York State law on anticompetition covenants is meant to prevent this result.

Moreover, I believe that the IAS court correctly rejected Frenkel's extrinsic evidence of an administrative agency's interpretations of the statutes it administers, as the agency's interpretations, which concern licensing and insurance company insolvency priorities meant to protect members of the public, have little if any bearing on the contractual language in Frenkel and Mallory's letter agreement.

Finally, as noted above, this is an apt occasion for application of the doctrine of contra proferentum (that is, the doctrine stating that a contract is to be construed against the drafter) against Frenkel, the drafter of the restrictive covenant (*see Arbeeny v Kennedy Exec. Search, Inc.*, 71 AD3d 177, 182 [1st Dept 2010]; *Yudell v Israel & Assoc.*, 248 AD2d 189, 189 [1st Dept 1998]). Here, not only did Frenkel present Mallory with a letter agreement that Frenkel drafted without any input from Mallory, but Mallory was not represented by an attorney when he signed the agreement.