[893 NYS2d 39]

Daniel N. Arbeeny, Appellant, v Kennedy Executive Search, Inc., et al., Respondents, et al., Defendants.

First Department, January 14, 2010

**APPEARANCES OF COUNSEL**

*Nathaniel B. Smith*, New York City, for appellant.

*DLA Piper LLP (US)*, New York City (*Cary B. Samowitz* of counsel), for respondents.

**OPINION OF THE COURT**

ACOSTA, J.

On or about January 5, 2006, plaintiff and defendant Kennedy Executive Search (KES), an executive recruitment firm, entered into an agreement whereby KES employed plaintiff as a senior executive search consultant. The agreement, drafted by KES's lawyers and governed by New York law, states that employment may be terminated by plaintiff or KES at any time, with or without cause or prior notice.

The agreement set plaintiff's salary at $125,000 per year and provided that "[s]uch salary shall be reviewed by Management from time to time, and any adjustment to such Salary shall be in the sole discretion of Management." In addition to salary, section 5.1 of the agreement provided that plaintiff was eligible "to earn commission compensation in respect of placements ar-

*ranged* by Employee on behalf of KES" as set out in article 5 (emphasis added). Section 5.2 of the agreement set forth a formula by which commissions were to be calculated.[1] Sections 5.3 and 5.7 provided that the commission amount would be paid to plaintiff in the calendar month following the month in which payment in full of the net fee income was received by KES from the client, provided KES had recovered plaintiff's salary and other costs. Section 5.6 (a), the portion at issue in this case, provides that "[n]o commission shall be due" in the event plaintiff "is not in the employ of KES at the date the commission payment would otherwise be made."

KES unilaterally reduced plaintiff's salary to $100,000 a year in October 2006, and terminated him on March 28, 2007 because he refused to accept KES's demand that he accept a reduction in his commissions.[2] According to KES, it received a fee in March for a placement plaintiff had handled. Pursuant to section 5.3, payment to plaintiff would have been due in April if plaintiff were still employed. To avoid unnecessary disputes, however, KES paid plaintiff $35,000 "without prejudice."[3] KES received other fees originated by plaintiff after March 2007, but no further commissions were paid to plaintiff.

In April 2007, plaintiff brought the instant action against KES, Kennedy Associates, Jason Kennedy, Jack Kandy (the pres-

---

1. Section 5.2 provides, in relevant part, that
   "the commission amount will be a percentage of the Net Fee Income to KES (which is defined as the total fee received by KES from the client, less any sales tax, in respect of placement(s) of candidate(s) arranged by Employee), after achieving the annual threshold amount determined in accordance with subparagraph 5.7 below. Such commission compensation shall be Thirty Percent . . . of up to Five Hundred Thousand . . . Dollars in Net Fee Income to KES, Forty Percent . . . of the Net Fee Income to KES of between Five Hundred Thousand Dollars . . . and One Million Dollars . . . , and Fifty Percent . . . of the Net Fee Income to KES exceeding One Million Dollars."
2. According to KES, plaintiff left voluntarily.
3. Pursuant to section 13.4,
   "[t]his Agreement may be amended, modified, superseded, [or] canceled . . . and the terms . . . hereof may be waived, only by a written instrument executed by both of the parties hereto, or in the case of a waiver, by the party waiving compliance. . . The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party of the breach of any term . . . contained in this Agreement, whether by conduct or otherwise, . . . shall be deemed to be . . . a further or continuing waiver of any such breach."

ident of KES), and Joel Kandy. He alleged that he was owed $12,500 in unpaid salary for six months, $223,970 in unpaid commissions, and another unspecified amount for placements that he was working on when he was terminated. The complaint asserted claims for breach of contract, unpaid salary and commissions pursuant to Labor Law §§ 191 and 198, quantum meruit/unjust enrichment, and violation of Business Corporation Law § 630.

In September 2007, defendants KES and Jack Kandy, the only defendants to have been served, moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). In granting the motion, the court noted that "the employment agreement expressly deprives plaintiff of post-termination commissions," and there was "no allegation that [KES] failed to pay to [plaintiff] commissions for placements he finalized and for which fees were received prior to his termination."

With respect to the Labor Law claims, the court found that "[d]espite the fact that [plaintiff]'s title was 'senior executive search consultant,' [he] qualifies as an 'employee' under the Labor Law." Nevertheless, it dismissed the Labor Law claims because "[t]he statutory remedies against an employer for the wilful failure to timely pay earned wages and commissions are unavailable where . . . there is no enforceable contractual right to those wages or commissions." The court dismissed the quantum meruit claim because of "the existence of [an] enforceable contract covering the disputed issue of the plaintiff's compensation." It dismissed the complaint against the other defendants as well, noting that they had not been served and were "sued only as alter egos of" KES.

■ Plaintiff's claim for $12,500 in unpaid salary for the reduction in pay from $125,000 to $100,000 is unavailing inasmuch as the agreement clearly stated that "any adjustment to such Salary shall be in the sole discretion of Management."

■ Plaintiff, however, has sufficiently stated a breach of contract claim for unpaid earned commissions that he "arranged" prior to his termination. Although generally an at-will employee is not entitled to post-termination commissions, the parties are certainly free to provide otherwise in a written agreement. For example, in *Yudell v Israel & Assoc.* (248 AD2d 189 [1998]), the employee earned commissions based on a percentage of all fees actually received that were "originated by" her. She brought an action to recover commissions for her role in securing two placements that were completed post-termination.

The employer contended that as a matter of law, the employee could not recover commissions for placements that were finalized after she left. In denying summary judgment, this Court held that the words "placements . . . originated by you" did not alone specify when or how the placement must be completed in order to entitle the employee to a commission (*id*. at 189). Had the employer meant to foreclose the possibility of the employee earning a post-termination commission on a placement unquestionably originated by her, it could have said so explicitly, such as "placements . . . originated *and completed* by you" or "placements . . . originated by you *which occur during your employment here*" (*id*. at 190).

In *Yudell*, we distinguished *McEntee v Van Cleef & Arpels* (166 AD2d 359, 360 [1990]), where the employee was not entitled to post-termination commissions because he had "failed to allege the existence of any contract entitling him to such unearned commissions nor the precise terms thereof." Accordingly, we rejected McEntee's "open-ended claim to commissions on unspecified future placements, where there was no contract setting forth either how such commissions would be calculated or what the limits of [the employer]'s purported obligation would be" (*Yudell* at 190). Likewise, in *Mackie v La Salle Indus.* (92 AD2d 821 [1983], *appeal dismissed* 60 NY2d 612 [1983]), we held that a salesperson was not entitled to commissions, on an account that she did not service for over a year, simply because she had originally obtained it. We noted in *Yudell* (at 190) that "[o]ther cases in which an at-will salesman has been denied commissions from post-termination sales similarly involve a plaintiff's indefinite and unlimited claim to commissions from all future transactions between its former employer and certain customers, simply because plaintiff was the one who initially secured these customers." The employee in *Yudell*, by contrast, sought commissions from two specific placements allegedly originated by her and could

> "point to a contract provision that establishes this calculation method and that supports the inference that her termination was not meant to extinguish her rights with respect to those placements. She [did] not claim the right to prospective commissions for the indefinite future simply because she allegedly originated defendant's relationship with those clients" (*id*. at 190-191).

Once the commission is earned, it cannot be forfeited (*see Davidson v Regan Fund Mgt. Ltd.*, 13 AD3d 117 [2004];[4] *Yudell*, 248 AD2d 189 [1998], *supra*). There is a long-standing policy against the forfeiture of earned wages, and this applies to earned, uncollected commissions as well (*Weiner v Diebold Group*, 173 AD2d 166, 166-167 [1991]).

Here, as in *Yudell*, plaintiff seeks commissions for placements "arranged" by him during his tenure at KES. Had KES "meant to foreclose the possibility that plaintiff might earn a post-termination commission on a placement" *arranged* by plaintiff, it "could have said so explicitly" (248 AD2d at 189-190). Under the doctrine of contra proferentem, an employment agreement should be construed against the drafter (*id.* at 189). Instead, section 5.1 states simply that plaintiff was entitled to commissions *arranged* by him. Sections 5.2, 5.3 and 5.7 merely provide the formula for determining the amount of the commission and the date when it vests,[5] as well as the month when payment was

---

**4.** Although *Pachter v Bernard Hodes Group, Inc.* (10 NY3d 609, 615-616 [2008]) abrogated that portion of the decision in *Davidson* where we had held that the cause of action under Labor Law § 198 (1-a) was properly dismissed on a finding of employment in an executive capacity, the remainder of *Davidson* remains good law.

**5.** *Pachter* (10 NY3d at 617) does not dictate a different result. There, the employee's commission consisted of a percentage of the amount billed minus particular charges that were reduced by certain business costs, such as finance charges for late payments, losses attributable to errors in placing advertisements, uncollectible debts, and travel and entertainment expenses, as well as a portion of an assistant's salary. Labor Law § 193, however, prohibits an employer from making deductions from wages, which include commissions, unless permitted by law or authorized by the employee for "insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee" (§ 193 [1] [b]). Since the deductions for business costs noted above were not within the category of permissible deductions delineated in section 193, their legality depended on when a commission was "earned" and became a "wage." "If the adjustments were made before the commissions were earned, section 193 did not prohibit them; but if the charges were subtracted after [the] commissions were earned, [the employer] engaged in impermissible practices under the statute" (10 NY3d at 617).

The Court noted that even though commissions under common law were earned when a broker produced a person ready and willing to enter into a contract on his employer's terms, the parties to a transaction were still free to depart from the common law by entering into a different arrangement, adding whatever conditions they might wish (*Feinberg Bros. Agency v Berted Realty Co.*, 70 NY2d 828, 830 [1987]), including the computation of downward adjustments from gross sales, billings or receivables, in which event the commission would not be deemed earned or vested until computation of the agreed-upon

to be made. They do not, however, otherwise modify the term *arranged* set forth in section 5.1. Being employed, after plaintiff fully performed by arranging a placement, has no bearing on the various calculations specified in sections 5.2 and 5.7.

Section 5.6 (a), which states that "[n]o commission shall be *due*" (emphasis added) in the event plaintiff "is not in the employ of KES at the date the commission payment would otherwise be made," is thus enforceable only to the extent it seeks to foreclose the right to prospective commissions for the indefinite future, such as sought by the plaintiffs in *McEntee* and *Mackie*. Indeed, the provision does not explicitly express an intent that earned commissions will be retroactively lost upon termination. Rather, the employment agreement provides for an increase in the commission percentage based on annual revenue targets. It also provides that the first year's commissions, i.e. 2006, were based specifically on that year's numbers, and subsequent commissions would be based on the "Employee's salary for the then current calendar year" (section 5.7). Finally, the agreement provides, in section 5.2, that in calculating commissions based on revenues, "there will be no carry-over to the next calendar year or look-back to the preceding year in determining commissions earned." These references support an interpretation that section 5.6 was intended not to cut off retroactive commissions earned during a calendar year, but rather to prevent prospective commissions in later years. Enforcing it in the manner argued by defendants would deprive plaintiff of earned commissions, and thus would be inconsistent with section 5.1 of the agreement as well as the public policy against forfeiting commissions.

Aside from the wording of the contract, inasmuch as an employee is entitled to the fruits of his or her labor, the at-will doctrine should not preclude plaintiff from raising a breach of contract claim for earned commissions. The implied covenant of good faith does not give rise to a contract action for the wrongful discharge of an at-will employee (*Murphy v American Home Prods. Corp.*, 58 NY2d 293, 304-305 [1983]). While an at-will employee cannot recover for termination per se, an employee's

formula (*Pachter*, 10 NY3d at 617-618). As applied to the present case, plaintiff's commissions were "earned" or "vested" after the various deductions provided for in sections 5.2, 5.3 and 5.7 were made. Otherwise, KES would have been in violation of Labor Law § 193. It does not follow from this holding, however, that a commission must be earned or vested pre-termination for plaintiff to receive it, where the agreement provides that plaintiff is entitled to the commission once it vests if he "arranged" the placement.

> "contract for payment of commissions creates rights distinct from the employment relation, and . . . obligations derived from the covenant of good faith implicit in the commission contract may survive the termination of the employment relationship. . . .

> "A covenant of good faith should not be implied as a modification of an employer's right to terminate an at-will employee because even a whimsical termination does not deprive the employee of benefits expected in return for the employee's performance. This is so because performance and the distribution of benefits occur simultaneously, and neither party is left high and dry by the termination. Where, however, a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the parties" (*Wakefield v Northern Telecom, Inc.*, 769 F2d 109, 112 [1985]; *see also Sibbald v Bethlehem Iron Co.*, 83 NY 378, 383-384 [1881]).

Although an at-will employee such as plaintiff would not be able to sue for wrongful termination of the contract, he should nonetheless be able to state a claim that the employer's termination action was specifically designed to cut off commissions that were coming due to the employee. A contract "cannot be read to enable the defendant to terminate an employee for the purpose of avoiding the payment of commissions which are otherwise owed. Such an interpretation would make the performance by one party the cause of the other party's non-performance" (*Wakefield*, 769 F2d at 112). *Berzin v Carey & Co.* (293 AD2d 320 [2002]) does not dictate a different result. In that case we rejected the employee's claim that the employer's "sole motivation in terminating him was to prevent the vesting of additional stock options and other compensation benefits, and that his termination therefore violated the covenant of good faith and fair dealing implied in every contract" (at 321). Stock options, however, are different from earned commissions in that the latter cannot be forfeited (*Weiner*, 173 AD2d at 167-168). In *Knudsen v Quebecor Print. (U.S.A.) Inc.* (792 F Supp 234, 239 [SD NY 1992]), the court distinguished *Gallagher v Lambert* (74 NY2d 562 [1989]), which involved a buy-back provision for employee stock, noting that *Knudsen* (and *Wakefield*, 769 F2d 109 [1985]) involved

"sales commissions due and owing to employees. A sales commission provision provides for an employer to pay its employees commissions earned through the employees' own efforts. In contrast, a stock buy-back provision affords employees a form of compensation that is related merely to the employees' length of tenure rather than to the extent of their efforts. The Second Circuit's finding of an implied covenant of good faith and fair dealing, while compelling in the sales commissions context, is less so in the stock buy-back context because buy-back provisions do not relate as directly to the efforts of employees as do sales commission provisions."[6]

■ The motion court also erred in dismissing plaintiff's Labor Law claims. Although it found that plaintiff was an employee and qualified for the protection of the Labor Law, it incorrectly held that there was no enforceable contractual right to those commissions.

We have considered plaintiff's remaining arguments and find them unavailing.

Accordingly, the order, Supreme Court, New York County (Eileen Bransten, J.), entered April 29, 2008, which granted the motion of defendants KES and Jack Kandy to dismiss the complaint, should be modified to the extent of vacating that portion of the judgment dismissing the breach of contract and Labor Law §§ 191 and 198 claims, and otherwise affirmed, without costs.

Motion seeking leave to supplement the record granted and cross motion to strike references to matters outside the record from plaintiff's reply brief denied.

---

**6.** Defendants argue that *Wakefield*, decided by the Second Circuit, has not been followed by several district courts (*see Baguer v Spanish Broadcasting Sys., Inc.*, 2007 WL 2780390, *9-10, 2007 US Dist LEXIS 70793, *26-28 [SD NY 2007]; *Plantier v Cordiant plc*, 1998 WL 661474, *3, 1998 US Dist LEXIS 15037, *8-9 [SD NY 1998]; *Collins & Aikman Floor Coverings Corp. v Froehlich*, 736 F Supp 480, 486 [SD NY 1990]), but neither the Second Circuit nor the New York State Court of Appeals has rejected it. In fact, *Knudsen* cited it with approval (792 F Supp at 239):

"It is important to note at the outset that the majority in *Gallagher* did not even consider *Wakefield*. Furthermore, given the *Gallagher* dissent's reliance on *Wakefield*, the majority had a clear invitation to signal either its acceptance or its rejection of *Wakefield* but it declined to do so. Therefore, if *Gallagher* is distinguishable from *Wakefield*, there is no reason to read into the majority's decision any assessment of *Wakefield*."

SAXE, J.P., SWEENY and RICHTER, JJ., concur.

Order, Supreme Court, New York County, entered April 29, 2008, modified to the extent of vacating that portion of the judgment dismissing the breach of contract and Labor Law §§ 191 and 198 claims, and otherwise affirmed, without costs. Motion seeking leave to supplement the record granted and cross motion to strike references to matters outside the record from plaintiff's reply brief denied.