******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KEVIN GEYSEN *v.* SECURITAS SECURITY SERVICES
USA, INC.
(SC 19545)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.*

*Argued March 28—officially released August 9, 2016*

*Daniel J. Krisch*, with whom, on the brief were *George D. Royster* and *Logan A. Forsey*, for the appellant-appellee (defendant).

*Todd D. Steigman*, for the appellee-appellant (plaintiff).

*Opinion*

ROGERS, C. J. This consolidated appeal[1] presents the question of whether an at-will employment agreement, providing that an employee's commissions will not be paid unless the employer has invoiced commissionable amounts to the client prior to the employee's termination, is contrary to public policy and a violation of General Statutes (Supp. 2016) § 31-72.[2] The defendant, Securitas Security Services, USA, Inc., appeals from the stipulated judgment of the trial court in favor of the plaintiff, Kevin Geysen, on his wage statute claim and the trial court's underlying ruling holding that this commission provision was contrary to public policy. Additionally, the plaintiff cross appeals claiming, inter alia, that the trial court improperly granted the motion to strike counts two and three of the complaint alleging breach of the implied covenant of good faith and fair dealing and wrongful termination in violation of public policy, respectively. We agree with the defendant that the trial court improperly determined that the commission provision violated public policy and constituted a violation of § 31-72. With regard to the plaintiff's cross appeal, we hold that count two of the plaintiff's complaint alleging breach of the implied covenant of good faith and fair dealing should not have been stricken but that count three alleging wrongful discharge was properly stricken. Accordingly, we reverse in part the judgment of the trial court.[3]

The following procedural history and facts are relevant to this appeal. The defendant is a security services company that provides various protection services to industrial and commercial clients. These services are marketed through employees hired as business development managers (managers) who solicit new business from prospective and existing customers. In August, 2005, the defendant offered the plaintiff an at-will position as a manager. The defendant's offer letter, which the plaintiff signed in September, 2005, provided that the plaintiff's compensation was a weekly base salary and commissions on contracts he procured.[4] The offer letter referenced and mirrored the defendant's 2003 sales incentive plan, which was in effect at the time the plaintiff commenced his employment.

The defendant subsequently amended its sales incentive plan effective December 23, 2006, and revised the commission provision at issue. Section II, part C of the 2006 sales incentive plan regarding sales eligibility requirements provides that "[c]*ommission is only paid once work has been performed and invoiced to the client.* Upon termination of services to the client all commissions cease, except that commission will be paid up through and including the final invoice. *Upon the* [*manager's*] *termination of employment, all commissions cease, except that any commissionable amounts that have been invoiced* [*to the client*] *prior*

*to the [manager's] [t]ermination [d]ate, as defined in* [s]ection *IV.D, will still be paid commission as part of final pay to the [manager]*." (Emphasis added.)

From 2005 to 2008, the plaintiff worked as a manager, on behalf of the defendant, marketing new and supplemental security services to new and existing customers. Based on the applicable sales incentive plan, once the contract was executed and the sales eligibility requirements were satisfied, including invoicing to the client, the plaintiff was entitled to commission payments without having to perform any other work.

On May 22, 2008, Thomas R. Fagan, the defendant's regional vice president for human resources, hand delivered a memorandum to the plaintiff terminating his employment. The memorandum explained that the defendant had conducted an investigation into improper business activities that had resulted in significant risk exposure to the defendant and, as a result of the investigation findings, the defendant was terminating the plaintiff's employment effective May 22, 2008.

On August 18, 2009, the plaintiff filed a complaint alleging that the defendant violated § 31-72, breached his employment contract by violating the implied covenant of good faith and fair dealing, and wrongfully discharged him in violation of public policy. The plaintiff alleged that the defendant's reasons for his termination "were false and a pretext for nonpayment of owed commissions." The defendant moved to strike count two, alleging breach of the implied covenant of good faith and fair dealing, and count three, alleging wrongful discharge in violation of public policy. Relying on *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 745 A.2d 178 (2000), the trial court granted the defendant's motion to strike both counts because it believed the plaintiff had an adequate statutory remedy under § 31-72. See id., 161–62 (holding that even if plaintiff's termination violated public policy embodied in statute, plaintiff's wrongful discharge claim would be precluded due to existence of statutory remedy under that statute) The trial court then rendered a partial judgment for the defendant on the two stricken counts.[5]

Before trial, the parties agreed that "the plaintiff's claim hinges on whether or not the language in the defendant's sales incentive plan, which provides that the right to commissions ceases upon the plaintiff's termination of employment, is enforceable." Therefore, the trial court agreed to decide the enforceability question and, in order to facilitate the trial court's determination, the parties entered into a stipulation of facts dated March 1, 2012.[6]

The trial court determined that, because the plaintiff's right to commissions was not contingent upon his providing any further services to the defendant's customers, he had fully earned his commissions when his

employment was terminated. Thus, the trial court found that since the provision in the sales incentive plan deprived him of those earned commissions, resulted in forfeiture of wages, and applied even to an employee who is terminated for no cause, the provision was unenforceable because it "violate[d] two public policies: the first, which strongly favors the payment of wages, and the second, which disfavors forfeitures."

On October 16, 2014, the parties stipulated to a judgment in favor of the plaintiff for unpaid commissions pursuant to § 31-72, but preserved their respective rights to appeal. The defendant appealed from the stipulated judgment and the plaintiff cross appealed. We now turn to the merits of those appeals.

I

We first address the defendant's claim that the commission provision was not void on public policy grounds and, therefore, the failure to pay the plaintiff's commissions was not a violation of § 31-72. We begin by setting out the applicable standard of review and relevant legal principles. "Although it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable. . . . [T]he question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Citations omitted; internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326–27, 885 A.2d 734 (2005); *Brown* v. *Soh*, 280 Conn. 494, 501, 909 A.2d 43 (2006); see also *State* v. *Lynch*, 287 Conn. 464, 477, 948 A.2d 1026 (2008).

"There is a strong public policy in Connecticut favoring freedom of contract . . . . This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability. . . . If a contract violates public policy, this would be a ground to not enforce the contract. . . . A contract . . . however, does not violate public policy just because the contract was made unwisely. . . . [C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts volunta-

rily and fairly made should be held valid and enforced in the courts." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Family Dental Group, P.C.*, 106 Conn. App. 765, 772–73, 943 A.2d 1122, cert. denied, 288 Conn. 911, 954 A.2d 184 (2008), quoting *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505–506, 746 A.2d 1277 (2000).

If the commission provision at issue acts to negate the wage statutes, however, the provision violates public policy. See *Parente* v. *Pirozzoli*, 87 Conn. App. 235, 246, 866 A.2d 629 (2005) ("Generally, agreements contrary to public policy, that is those that negate laws enacted for the common good, are illegal and therefore unenforceable. . . . Agreements that are legal on their face, yet which are designed to evade statutory requirements, are routinely held unenforceable." [Citation omitted; internal quotation marks omitted.]). We must initially determine, therefore, whether the commission provision violates the wage statutes.

We have held that § 31-72 "does not embody substantive standards to determine the amount of wages that are payable but provides penalties in order to deter employers from deferring wage payments once they have accrued. Section 31-72 is, therefore, a remedial statute rather than one creating independent substantive rights. . . . [This] interpretation of § 31-72 supports the notion that the wage statutes, as a whole, do not provide substantive rights regarding *how* a wage is earned; rather, they provide remedial protections for those cases in which the employer-employee wage agreement is violated. The wage agreement is not dictated by the statutes; instead, it is the integrity of that wage agreement that is protected by the statutory provisions." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 162, 793 A.2d 1068 (2002). In other words, the Connecticut wage statutes "[do] not purport to define the wages due; [they] merely [require] that those wages agreed to will not be withheld for any reason." Id., 160; *State* v. *Lynch*, supra, 287 Conn. 472.

"In *Mytych* [v. *May Dept. Stores Co.*, supra, 260 Conn. 156], [the court] considered the question of whether the defendant employer's practice of calculating the plaintiff employees' sales commissions by deducting from their respective gross sales figures a pro rata share of unidentified returns . . . violated a statutory provision disallowing unauthorized deductions from wages."[7] *State* v. *Lynch*, supra, 287 Conn. 472. The court held that it did not, as the Connecticut wage statutes left the substantive standards for the determination of wages to the agreement between the employer and the employee. Id. Specifically, the court held that "the formula by which an employee's wage is calculated is determined by the agreement between the employer

and the employee"; *Mytych* v. *May Dept. Stores Co.*, supra, 160; because the definition of wages "expressly [left] the determination of the wage to the employer-employee agreement, assuming some specific conditions, such as a minimum hourly wage, are met." Id., 163.

The court in *Mytych* then explicitly rejected the plaintiffs' reasoning that their wages accrued at the time they rendered their services by making sales because, while the California case cited by the plaintiffs relied "on a long history of California case law and regulatory opinions establishing that an employee's right to a commission accrues or vests at the time of the actual sale . . . [i]n Connecticut, there [was] no such settled doctrine regarding the time at which an employee's rights to his wages vests and, in fact, we [had] concluded [t]herein that *our wage payment statutes expressly leave the timing of accrual to the determination of the wage agreement between the employer and [the] employee.*" (Emphasis added.) Id., 164–65; see *State* v. *Lynch*, supra, 287 Conn. 473, 476.

With these applicable legal principles in mind, we now address whether the commission provision in the present case violates public policy and the wage statutes. The court in *Mytych* clearly addressed the timing of wage accrual and left the determination of this matter to the employment agreement. See *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 164–65. Additionally, in *Mytych*, this court specifically rejected the doctrine that an employee's right to wages necessarily accrued at the time of sale. In the present case, on the basis of the clear language of the commission provision, invoicing prior to the plaintiff's termination is a condition precedent to earning the commission. In fact, the plaintiff concedes that for the payment of commissions, the sales eligibility requirements in the applicable sales incentive plan were required to be satisfied.[8] One of the sales eligibility requirements was that the commissionable amounts be invoiced to the client prior to the manager's termination. Thus, we agree with the defendant that the commissions were not "due" within the meaning of General Statutes 31-71b (a)[9] because there was a condition precedent to their accrual that had not been satisfied. Nevertheless, the plaintiff contends that the commission provision should not be enforceable because he did not have to provide any further services to the defendant's customers and, therefore, he had fully earned his commissions under the wage statutes.[10]

In *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 163–64 and n.7, however, the employees did not have to provide any additional services and this court still held that their wages had not accrued at the time of sale. Likewise, in *Kelley* v. *Sun Microsystems, Inc.*, 520 F. Supp. 2d 388, 407 (D. Conn. 2007), the federal District Court, applying Connecticut law, rendered summary

judgment in favor of the defendant employer on a § 31-72 claim. The plaintiff employee identified thirteen sales orders that had been shipped prior to the employee's official termination. Id., 406. The employer's governing sales compensation plan provided that a "[c]ommission is earned on direct business and considered due and payable to any participant in the commission plan upon revenue recognition and receipt by [the defendant] of full payment for all commissionable products." Id. In addition, the contract in *Kelley* indicated that no incentive commissions would be made without a fully executed employee "[g]oal [s]heet" signed by the client, two levels of management and the area controller for that fiscal year. Id. As the employee did not have a goal sheet for that fiscal year, relying on *Mytych*, the District Court was "forced to conclude" that the employer had not failed to pay "wages" under the wage statutes. Id.; see also *Mullowney* v. *Data General Corp.*, 143 F.3d 1081, 1083 (7th Cir. 1998) (applying Massachusetts law and finding that, although there was certainly risk that employee could lose commissions on some sales for which he was primarily responsible based on at-will agreement where employee would be entitled to commissions only on those sales invoiced or shipped before his termination became effective, "[t]his was the bargain he made . . . he cannot now . . . be heard to complain because [the employer] adhered to this arrangement"); cf., e.g., *State* v. *Lynch*, supra, 287 Conn. 476 (noting that under *Ravetto* v. *Triton Thalassic Technologies*, *Inc.*, 285 Conn. 716, 725–26, 941 A.2d 309 [2008], "an agreement between informed, sophisticated employees and their employer to defer accrual of future wages until the employer receives income [was] not unreasonable and, in fact, may well [have been] beneficial to all parties concerned" and as such did not violate public policy).

On the basis of our review of Connecticut law and the public policy of freedom of contract reflected in our common law, we do not believe that this commission provision on its face "negate[s] laws enacted for the common good" or is "designed to evade statutory requirements . . . ." (Internal quotation marks omitted.) *Parente* v. *Pirozzoli*, supra, 87 Conn. App. 246. We conclude, therefore, that the contract provision providing that commissions will be paid only if the work had been invoiced prior to termination of the employee does not violate public policy and is enforceable. Because the plaintiff was not due his commissions under the express and enforceable terms of his agreement with the defendant, and the agreement does not violate public policy, we hold that there was no violation of the wage statutes.

## II

We now turn to the plaintiff's cross appeal from the trial court's grant of the defendant's motion to strike

two counts of the complaint. "We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 309 Conn. 342, 350, 71 A.3d 480 (2013).

### A

We analyze first the plaintiff's cross appeal seeking reinstatement of the breach of the implied covenant of good faith and fair dealing count. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."[11] (Citations omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 432–33, 849 A.2d 382 (2004); *Landry* v. *Spitz*, 102 Conn. App. 34, 47, 925 A.2d 334 (2007) ("[s]tated otherwise, the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty" [internal quotation marks omitted]).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies . . . actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest

mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, supra, 269 Conn. 433. "[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . . *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 667, 778 A.2d 237 (2001), quoting 2 Restatement (Second), Contracts § 205, comment (d) (1981); see also 23 S. Williston, Contracts (4th Ed. Lord 2002) § 63:22, p. 508 (a party who evades the spirit of the contract . . . may be liable for breach of the implied covenant of good faith and fair dealing . . .)." (Internal quotation marks omitted.) *Landry* v. *Spitz*, supra, 102 Conn. App. 43. "[W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and fair dealing, and hence, a breach of contract, for which damages may be recovered . . . ." (Internal quotation marks omitted.) Id., 44.

In *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984), this court addressed the implied covenant of good faith and fair dealing in employment contracts. The plaintiff in that case contended that the good faith principle was applicable and subjected the employer to liability whenever an employee is discharged without just cause. Id., 567. For guidance, the court looked to Massachusetts cases applying the implied covenant of good faith and fair dealing in the employment context. Id., 569–71. While the court recognized the applicability of the covenant of good faith to employment contracts, it concluded that a breach of such an implied covenant cannot be predicated simply upon the absence of good cause for discharge. Id., 571–72. The court specifically declined the plaintiff's invitation "to transform the requirement of good faith into an implied condition that an employee may be dismissed only for good cause." Id., 571; see also *Carbone* v. *Atlantic Richfield Co.*, 204 Conn. 460, 469–70, 528 A.2d 1137 (1987), quoting *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679 n.2, 513 A.2d 66 (1986). In *Magnan*, the court left for another day the determination of the applicability of the covenant of good faith and fair dealing to a discharge that was motivated by an intent to deprive an employee of clearly identifiable compensation related to past services. See *Magnan* v. *Anaconda Industries, Inc.*, supra, 573. As such, the court acknowledged, but did not fully consider, the Massachusetts case of *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977). See *Magnan* v. *Anaconda Industries, Inc.*, supra, 570 n.20, 571.

*Fortune* is particularly illustrative in our present case.

In *Fortune*, under the express terms of an at-will employment contract, the plaintiff employee had received all the bonus commissions to which he was entitled when his employment with the defendant was terminated. *Fortune* v. *National Cash Register Co.*, supra, 373 Mass. 101. The court acknowledged that "an employer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances." Id., 101–102. Nevertheless, the Massachusetts Supreme Judicial Court held that the employer's written contract contained an implied covenant of good faith and fair dealing and that, in a situation where commissions are to be paid for work performed by the employee, a bad faith termination constituted a breach of that contract.[12] Id.

The court in *Fortune* further stated that "[w]here the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and the buyer is to be regarded as having been accomplished by the agent. . . . The same result obtains where the principal attempts to deprive the agent of any portion of a commission due the agent. Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services." (Citation omitted.) Id., 104–105.

Thus, although an employer may terminate the employee at will; see *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 572; the employer may not act in bad faith to prevent paying the employee commissions he reasonably expected to receive for services rendered under the contract. See id., 571, 572 (leaving open, but not disapproving of, application of good faith principle to employment contracts in restricted manner illustrated by Massachusetts cases, nonetheless emphasizing that principle's "essence is the fulfillment of the reasonable expectations of the parties"); see also *Cochran* v. *Quest Software, Inc.*, 328 F.3d 1, 8 (1st Cir. 2003) ("[t]he rationale behind [the Massachusetts] exception is that every contract contains a covenant of good faith and fair dealing, and an employer breaches that covenant when it dismisses an at-will employee in order to deprive him of compensation fairly earned and legitimately expected for services already rendered"), citing *Mullowney* v. *Data General Corp.*, supra, 143 F.3d 1083–84; *Wakefield* v. *Northern Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985) ("[w]here . . . a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the

parties").

To be clear, an employer does not act in bad faith solely by refusing to pay commissions on sales invoiced after an employee's termination if that obligation is an express contract term. See *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 567, 572; see also *Mullowney* v. *Data General Corp.*, supra, 143 F.3d 1084 and n.4. An employer's action or inaction that attempts to avoid the spirit of the bargain or which evinces a dishonest purpose, however, would violate the implied covenant of good faith and fair dealing as it relates to the contractual provision for payment of commissions. See *Empower Health, LLC* v. *Providence Health Solutions LLC*, Docket No. 3:10-CV-1163 (JCH), 2011 WL 2194071, *8 (D. Conn. June 3, 2011) (finding that plaintiff stated cause of action for breach of implied covenant of good faith and fair dealing under Connecticut law because plaintiff could not have reasonably expected that defendant would actively interfere with plaintiff's ability to earn commissions under agreement pursuant to which plaintiff contracted to promote defendant's software and consulting services, especially in light of fact that sales commissions were only form of compensation), citing *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, supra, 269 Conn. 432, and *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007); *Mullowney* v. *Data General Corp.*, supra, 143 F.3d 1084 (finding that, under Massachusetts law, employee could attempt to show that employer violated its implied duty of good faith and fair dealing by somehow interfering with employee's ability to secure commissions); see also *Wakefield* v. *Northern Telecom, Inc.*, supra, 769 F.2d 112–13 ("in circumstances in which agents or employees cannot be directly supervised and their performance cannot be effectively monitored or measured apart from concrete results . . . an unfettered right to avoid payment of earned commissions in the principal or employer creates incentives counterproductive to the purpose of the contract itself in that the better the performance by the employee, the greater the temptation to terminate").

In the present case, the trial court considered the plaintiff's claim that the covenant was breached to be essentially the same as a wrongful discharge claim. A breach of the implied covenant of good faith and fair dealing contract claim, however, is different than a wrongful termination claim because the former focuses on the fulfillment of the parties' reasonable expectations rather than on a violation of public policy.[13] As articulated in *Wakefield* v. *Northern Telecom, Inc.*, supra, 769 F.2d 112, while an at-will employee may not be able to "recover for his termination per se . . . the contract for payment of commissions creates rights distinct from the employment relation, and . . . obligations derived from the covenant of good faith implicit

in the commission contract may survive the termination of the employment relationship. Implied contractual obligations may coexist with express provisions which seemingly negate them where common expectations or the relationship of the parties as structured by the contract so dictate. . . . A covenant of good faith should not be implied as a modification of an employer's right to terminate an at-will employee because even a whimsical termination does not deprive the employee of benefits expected in return for the employee's performance. This is so because performance and the distribution of benefits occur simultaneously, and neither party is left high and dry by the termination.

"Where, however, a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the parties. . . . [*A contract*] *cannot be read to enable the defendant to terminate an employee for the purpose of avoiding the payment of commissions which are otherwise owed.* Such an interpretation would make the performance by one party the cause of the other party's [nonperformance]." (Emphasis added; citations omitted.) Accord *Arbeeny* v. *Kennedy Executive Search, Inc.*, 71 App. Div. 3d 177, 184, 893 N.Y.S.2d 39 (2010) ("[a]lthough an at-will employee such as [the] plaintiff would not be able to sue for wrongful termination of the contract [under New York law], he should nonetheless be able to state a claim that the employer's termination action was specifically designed to cut off commissions that were coming due to the employee").[14]

We find the reasoning in *Fortune*, *Wakefield* and *Arbeeny* persuasive, and therefore, recognize the availability of a breach of the implied covenant of good faith and fair dealing contract claim when the termination of an employee was done with the intent to avoid the payment of commissions.

Turning to the allegations of the plaintiff's complaint in the present case, the plaintiff claims in relevant part that the defendant had "failed to pay commissions due to [the] [p]laintiff on certain sales made" and as such, the "[d]efendant's aforementioned conduct violated the implied covenant of good faith and fair dealing by failing to comply with [the] [p]laintiff's reasonable expectation that the [d]efendant would pay commissions earned by the [p]laintiff." These allegations focus on damages suffered due to the violation of the plaintiff's reasonable expectation regarding the payment of commissions.[15] If an employer can be shown to have interfered in bad faith with an employee's ability to secure his commissions, this would violate the reasonable expectation that his employer would not inhibit his ability to earn commissions he worked for under the contract. See *Empower Health, LLC* v. *Providence Health Solutions, LLC*, supra, 2011 WL 2194071, *8; *Mullowney* v. *Data*

*General Corp.*, supra, 143 F.3d 1083–84. Accordingly, on the basis of the allegations in the complaint, the plaintiff has stated a legally sufficient claim for breach of the implied covenant of good faith and fair dealing.

B

As to the plaintiff's wrongful discharge against public policy count, we agree with the trial court that it should have been stricken. "In *Sheets* v. *Teddy's Frosted Foods, Inc.*, [179 Conn. 471, 475, 427 A.2d 385 (1980)] . . . we recognized . . . a common law cause of action in tort for discharges if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy. . . . This public policy exception to the employment [at-will] rule carved out in *Sheets* attempts to balance the competing interests of [the] employer and [the] employee. Under the exception, the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy. The employer is allowed, in ordinary circumstances, to make personnel decisions without fear of incurring civil liability. Employee job security, however, is protected against employer actions that contravene public policy." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 678–79.

"The question of whether a challenged discharge violates public policy . . . is a question of law to be decided by the court . . . ." *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 588, 693 A.2d 293 (1997). "In *Morris* v. *Hartford Courant Co.*, supra, [200 Conn. 680], we recognized the inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contour of the public policy exception. In evaluating claims, [w]e look to see whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy. . . . *Faulkner* v. *United Technologies Corp.*, [supra, 580–81]." (Internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 698–99, 802 A.2d 731 (2002).

"[W]e repeatedly have underscored our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one . . . . Consequently, we have rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy." (Citations omitted; internal quotation marks omitted.) Id., 701.

In his reply brief, the plaintiff points us to the wage statutes and suggests that they espouse the important

public policy in favor of the payment of wages, which the defendant contravened with his termination. Consistent with our conclusion in part I of this opinion, however, the wage statutes promote a public policy favoring the payment of *earned* wages. They should not be read to provide a broader public policy mandate than that which is represented. See *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 804, 734 A.2d 112 (1999) ("In declining to recognize an important public policy to that effect, we are mindful that we should not ignore the statement of public policy that is represented by a relevant statute. . . . Nor should we impute a statement of public policy beyond that which is represented. To do so would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate." [Citation omitted.]). In other words, while the wage statutes provide a remedy for unpaid earned wages, they do not provide one for unearned wages that were not due. *Mytych* v. *May Dept. Stores Co.*, supra, 260 Conn. 162.

As we have determined in this case that the commission provision provided is enforceable and does not violate the public policy embodied in § 31-72, the exercise of the defendant's at-will right to terminate the plaintiff does not violate statutorily based public policy.[16]

We acknowledge that the plaintiff goes beyond statutorily based public policy in his complaint. The plaintiff alleges that his employment was terminated "as a pretext to deprive him of the just fruits of his labor" and that this violates "the public policy of justly compensating employees for their work." We believe, however, that the parameters of the public policy of this state with regard to the payment of wages is reflected in the wage statutes and that an employee cannot use the nonpayment of wages that have not accrued as the basis for a wrongful discharge claim. We leave it to the legislature to decide if it wishes to expand this public policy to include unearned wages in this context. See *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 715; *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 572. Consequently, we agree with the judgment of the trial court striking this count.[17]

The judgment is reversed only with respect to the trial court's determination that the agreement violated public policy and § 31-72, and with respect to that court's granting of the motion to strike the count of the complaint alleging breach of the implied covenant of good faith and fair dealing, and the case is remanded with direction to deny the motion to strike that count of the complaint and for further proceedings according to law.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this

court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Justice Eveleigh was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] The defendant appealed, and the plaintiff cross appealed, to the Appellate Court from a stipulated judgment in favor of the plaintiff and against the defendant for unpaid commissions, but preserving their respective appeal rights. We transferred both the appeal and the cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes (Supp. 2016) § 31-72 provides in relevant part: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization shall recover, in a civil action, (1) twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the underpayment of wages was in compliance with law, the full amount of such wages or compensation, with costs and such reasonable attorney's fees as may be allowed by the court. Any agreement between an employee and his or her employer for payment of wages other than as specified in said sections shall be no defense to such action. . . ."

Although § 31-72 was amended subsequent to the time the plaintiff filed his complaint in the present action; see Public Acts 2015, No. 15-86, § 2; those changes are not relevant to this appeal. For purposes of convenience, references herein are to the current revision of the statute that is codified in the 2016 Supplement.

The definition of "wages" under § 31-72 includes commissions. See General Statutes § 31-71a (3) ("'[w]ages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation"). On appeal, the defendant does not challenge that these commissions were wages.

[3] Due to our holding, we need not address the plaintiff's additional cross appeal issue concerning the trial court's denial of an award of double damages and attorney's fees pursuant to § 31-72. With regard to the plaintiff's discovery requests, the issue may be addressed on remand.

[4] The parties do not dispute that the plaintiff procured the accounts at issue.

[5] After this determination, the plaintiff amended his complaint to add a claim of unjust enrichment. The defendant then moved for summary judgment on the violation of § 31-72 count, however, the trial court denied the motion. The plaintiff claims that his unjust enrichment claim was part of the stipulated judgment entered in his favor. Because this claim is inadequately briefed and is not relevant to our determinations, we do not address this argument.

[6] In the parties' stipulation, the plaintiff conceded that he understood the provision in the 2006 sales incentive plan, which provides that "[u]pon the [manager's] termination of employment, all commissions cease," to mean that he was not entitled to commissions on invoices executed after his termination date.

[7] See General Statutes § 31-71e (permitting partial withholding of wages under certain circumstances).

[8] We agree with the defendant that the plaintiff's claim that the 2006 sales incentive plan was not a contract is not preserved. Additionally, as we explain in part II A of this opinion, the implied covenant of good faith and fair dealing attaches to specific contract terms and if the sales incentive plan is not part of the agreement between the plaintiff and the defendant, the plaintiff's newly revived second count would not be available. We also note that the plaintiff signed the 2006 sales incentive plan and continued to work and receive compensation.

[9] General Statutes § 31-71b (a) (1) provides in relevant part: "[E]ach employer, or the agent or representative of an employer, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank that has agreed with the employer to accept such wage deposits."

[10] Although the plaintiff claims that the commission provision causes an

unacceptable forfeiture of wages earned, we agree with the defendant that the trial court's reliance on our forfeiture jurisprudence in *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 414–15, 538 A.2d 219 (1988), overruled on other grounds by *Arrowood Indemnity Co.* v. *King*, 304 Conn. 179, 201, 39 A.3d 712 (2012), is inapplicable to the current situation because we have determined that the plaintiff had not earned the commissions under the employment agreement.

[11] "Essentially [the implied covenant of good faith and fair dealing] is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 567, 479 A.2d 781 (1984).

[12] The court in *Fortune* v. *National Cash Register Co.*, supra, 373 Mass. 102, noted that while some other courts had fashioned a remedy in tort to avoid the rigidity of the "at will" rule, it believed that there was a remedy based on the contract. See *Siles* v. *Travenol Laboratories, Inc.*, 13 Mass. App. 354, 358, 433 N.E.2d 103 (1982) (distinguishing bad faith termination claim that involved intent to benefit financially at employee's expense, such as retaining sales commissions that would otherwise be due employee as in *Fortune*, from bad faith termination claim where employer's reason for discharge was contrary to public policy). The Massachusetts Supreme Judicial Court subsequently stated that the employer's predatory motivation in *Fortune* could be classified as a reason contrary to public policy. See *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 303, 431 N.E.2d 908 (1982); *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 570 n.20 (identifying that in Massachusetts there was wrongful termination cause of action based on contractual implied covenant of good faith and fair dealing where employer's predatory motivation was in violation of public policy); see also *Hunt* v. *Wyle Laboratories, Inc.*, 997 F. Supp. 84, 90–91 (D. Mass. 1997) (describing three separate lines of Massachusetts cases that all "stand together under a public policy umbrella").

[13] Under such a claim, termination is incidental, or a means, to accomplish the breach of the implied covenant of good faith and fair dealing. Cf., e.g., *Empower Health, LLC* v. *Providence Health Solutions, LLC*, supra, 2011 WL 2194071, *8 (plaintiff limited liability company alleged that defendant deliberately prevented plaintiff from closing on sales it initiated by assuming control over relationships with plaintiff's sales leads, removing plaintiff's access to sales system, and terminating plaintiff's e-mail account).

[14] In *Wakefield* v. *Northern Telecom, Inc.*, supra, 769 F.2d 111–13, in analyzing New Jersey and New York law, the Second Circuit Court of Appeals held that the jury could have awarded damages if it found that the employer discharged the employee in order to avoid paying him commissions earned on sales that were completed but for formalities. In *Arbeeny* v. *Kennedy Executive Search, Inc.*, supra, 71 App. Div. 3d 183–84, the court held that an at-will employee could state a claim for breach of contract to recover unpaid earned commissions.

[15] The defendant claims that "the plaintiff did not allege that [he was fired] in order to deprive him of commissions that he might have earned at some unknown time in the future" due to the plaintiff's numerous assertions that the alleged commissions were "earned" and "due to him." Reading the complaint broadly, as we must, we find this argument unpersuasive. We believe that, although the plaintiff had not "earned" the commissions under the wage statutes, he may yet be able to demonstrate that he was nevertheless "owed" them because he was prevented from earning them due to the employer's breach of the implied covenant of good faith and fair dealing. In the present case, the plaintiff did allege that the defendant's "reasons for [his] termination were false and a pretext for nonpayment of *owed* commissions." (Emphasis added.)

[16] Based on our discussion in part II A of this opinion, if an employer exercises the right to terminate in order to interfere in bad faith with an employee's ability to secure commissions, however, the employee's reasonable expectations would be violated and he or she can recover in contract.

[17] Due to our determination, we need not address the defendant's argument, based on *Burnham* v. *Karl & Gelb, P.C.*, supra, 252 Conn. 153, regarding the adequacy of the statutory remedy under § 31-72.